# 21-2095

## United States Court of Appeals
## for the Second Circuit

CHAZ PERRY, WAYNE ASKEW, BRANDAN BASS, JAMES
BEDDIA, and FRANTZ BONNEAU, *et al.*,

*Plaintiffs-Appellees,*

*against*

CITY OF NEW YORK and
NEW YORK CITY FIRE DEPARTMENT,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Southern District of New York

### BRIEF FOR APPELLANTS

GEORGIA M. PESTANA
*Corporation Counsel*
*of the City of New York*
Attorney for Appellants
100 Church Street
New York, New York 10007
212-356-5042 or -0817
dmatza@law.nyc.gov

RICHARD DEARING
DEVIN SLACK
DANIEL MATZA-BROWN
   *of Counsel*

December 10, 2021

Reproduced on Recycled Paper

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................iv

PRELIMINARY STATEMENT ............................................................ 1

JURISDICTIONAL STATEMENT ..................................................... 5

ISSUES PRESENTED FOR REVIEW ................................................ 6

STATEMENT OF THE CASE ............................................................ 7

    A. FLSA's guarantee of overtime pay and the parties' collective bargaining agreement that gives EMTs and paramedics even broader access to overtime ........................... 7

    B. Plaintiffs' lawsuit under FLSA .................................................. 9

        1. The court's pretrial finding that the plaintiffs were similarly situated in two discrete ways ................................. 9

        2. The trial evidence regarding the City's time-reporting system and the overtime plaintiffs allegedly worked, but did not report ................................................................. 10

            a. The City's system for employees to report their time so that they could be fairly paid ............ 11

            b. Plaintiffs' testimony about the tasks they allegedly performed but for which they failed to request overtime ................................................. 15

            i. The start of plaintiffs' tours ................................ 15

            ii. The end of plaintiffs' tours .................................. 20

i

# TABLE OF CONTENTS (cont'd)

**Page**

c. Plaintiffs' 1.7 million overtime requests granted during the time period at issue ............... 23

d. Plaintiffs' damages theory and calculations .......... 26

3. The jury charge, the jury's voiced confusion about the verdict sheet during deliberations, and the verdict ............ 28

4. Post-trial proceedings .......................................... 31

STANDARD OF REVIEW AND SUMMARY OF ARGUMENT ........... 33

ARGUMENT ................................................................ 37

POINT I ..................................................................... 37

PLAINTIFFS FAILED TO PROVE LIABILITY FOR THEIR ALLEGED PRE-SHIFT WORK .................................................... 37

A. The City is not liable for work that plaintiffs failed to report using CityTime, where the City neither required the work to be done outside regular hours nor actually knew about such off-shift work. ................................. 38

1. The City did not require plaintiffs to perform the work at issue outside regular hours. ............................. 39

2. The City did not actually know plaintiffs were performing unpaid work pre-shift. ....................................... 41

3. There is no legitimate basis for disregarding the City's system for reporting overtime, much less on a collective-wide basis. ............................................... 44

## TABLE OF CONTENTS (cont'd)

**Page**

B. Even assuming constructive knowledge matters, plaintiffs failed to prove that the City had constructive knowledge of their unpaid pre-shift work on a collective-wide basis. ................................................................. 49

C. In any event, any underpayment was not willful. ................... 54

POINT II .......................................................................................... 57

A NEW DAMAGES TRIAL IS NECESSARY BECAUSE THE COURT PREVENTED THE JURY FROM DECIDING THE KEY FACTUAL DISPUTE ABOUT DAMAGES ................. 57

POINT III ......................................................................................... 63

A NEW TRIAL ON EMTs' POST-SHIFT CLAIMS IS NEEDED BECAUSE THE COURT PREVENTED THE JURY FROM CONSIDERING THE CITY'S KEY DEFENSE ..... 63

CONCLUSION ................................................................................. 69

CERTIFICATE OF COMPLIANCE ............................................... 70

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Bd. of Pub. Educ.*,
   495 F.3d 1306 (11th Cir. 2007) .......................................................... 45

*Allen v. City of Chicago*,
   865 F.3d 936 (7th Cir. 2017) ............................................................... 45

*Anderson v. Branen*,
   17 F.3d 552 (2d Cir. 1994) .................................................................. 35

*Anderson v. Mt. Clemens Pottery Co.*,
   328 U.S. 680 (1946) .................................................................... 28, 63

*Blyden v. Mancusi*,
   186 F.3d 252 (2d Cir. 1999) ............................................................... 60

*Boyd v. Collins*,
   11 N.Y.2d 228 (1962) ......................................................................... 47

*Chao v. Gotham Registry, Inc.*,
   514 F.3d 280 (2d Cir. 2008) ............................................................... 67

*Clarke v. City of N.Y.*,
   347 F. App'x 632 (2d Cir. 2009) ........................................................ 67

*Craig v. Bridges Bros. Trucking LLC*,
   823 F.3d 382 (6th Cir. 2016) .............................................................. 46

*Forrester v. Roth's I.G.A. Foodliner, Inc.*,
   646 F.2d 413 (9th Cir. 1981) ........................................................ 38, 39

*Glatt v. Fox Searchlight Pictures, Inc.*,
   811 F.3d 528 (2d Cir. 2015) ............................................................... 36

*Gordon v. Kaleida Health*,
   299 F.R.D. 380 (W.D.N.Y. 2014) ....................................................... 38

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Gorman v. Consol. Edison Corp.*,
  488 F.3d 586 (2d Cir. 2007) ........................................................ 44, 64

*Henry v. Wyeth Pharm., Inc.*,
  616 F.3d 134 (2d Cir. 2010) ............................................................... 36

*Hertz v. Woodbury Cty.*,
  566 F.3d 775 (8th Cir. 2009) .................................................. 38, 45, 46

*Holzapfel v. Town of Newburgh*,
  145 F.3d 516 (2d Cir. 1998) ............................................................... 50

*Integrity Staffing Solutions, Inc. v. Busk*,
  574 U.S. 27 (2015) ............................................................................. 44

*Kosakow v. New Rochelle Radiology Assocs., P.C.*,
  274 F.3d 706 (2d Cir. 2001) ............................................................... 67

*Kuebel v. Black & Decker Inc.*,
  643 F.3d 352 (2d Cir. 2011) .............................................. 7, 38, 43, 54

*Lindow v. United States*,
  738 F.2d 1057 (9th Cir. 1984) .................................................. 65, 66, 67

*Newton v. City of Henderson*,
  47 F.3d 746 (5th Cir. 1995) .......................................................... 38, 39

*Reich v. N.Y.C. Transit Auth.*,
  45 F.3d 646 (2d Cir. 1995) ................................................................. 65

*Scott v. Chipotle Mexican Grill, Inc.*,
  954 F.3d 502 (2d Cir. 2020) ............................................... 3, 9, 42, 49

*Singh v. City of N.Y.*,
  524 F.3d 361 (2d Cir. 2008) ............................................................... 65

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Warren v. Pataki,*
  823 F.3d 125 (2d Cir. 2016) .......................................................... 33

*White v. Baptist Mem'l Health Care,*
  699 F.3d 869 (6th Cir. 2012) ...................................................... 38, 39


**Statutes**

28 U.S.C. § 1291 ............................................................................. 5

28 U.S.C. § 1331 ............................................................................. 5

29 U.S.C. § 203(g) .......................................................................... 7

29 U.S.C. § 207 ............................................................................... 5

29 U.S.C. § 207(a)(1) ...................................................................... 8

29 U.S.C. § 211(c) ......................................................................... 38

29 U.S.C. § 216 ............................................................................. 31

29 U.S.C. § 260 ............................................................................. 31


**Regulations**

29 C.F.R. § 785.48 ........................................................................ 55

29 C.F.R. § 785.48(b) ...................................................................... 8

29 C.F.R. § 790.8 .......................................................................... 44

## PRELIMINARY STATEMENT

This case is about whether a government employer with well over 100,000 employees must ferret out sporadic and random inaccuracies in employees' self-reported timesheets to avoid crushing liability under the Fair Labor Standards Act (FLSA). Appellant City of New York tries hard to compensate its employees for all their work. The City's electronic timekeeping system, CityTime, enables employees to report precisely how much time they worked, so that the City can compensate them fully.

Plaintiff-appellees, 2,519 EMTs and paramedics, obtained a nearly $17 million judgment on FLSA claims for time allegedly worked before or after their scheduled shifts, despite their failure to report the time as time worked and request overtime through CityTime. Their expert estimated damages of $5.34 per plaintiff per week, translating to roughly two unreported 15-minute periods per month per plaintiff. But the City processed—and granted—thousands of plaintiffs' other overtime requests every week. The law does not require employers to be omniscient, and plaintiffs have no viable theory as to how the City could have reliably detected this scattershot work, much less how the City was obligated to do so.

Other circuits have largely rejected employees' attempts to obtain damages for worktime never reported to their employer, except in three narrow circumstances: if the employer required the work to be done during unpaid time, had actual knowledge of the unpaid work, or prevented the worker from requesting and receiving overtime. This Court should adopt that bright-line defense to FLSA liability, which makes especially good sense in the public employment context. To avoid waste and conserve resources for other public needs, government employers should not be forced to *presume* work is being done when employees fail to report it, and pay for that work with public funds, unless the employer affirmatively requires the work or has actual knowledge it is being done.

That test, applied here, would leave intact the liability finding for paramedics' post-shift work. But the liability finding on plaintiffs' pre-shift work claims should be reversed. For that work, plaintiffs' theory of liability—as repeatedly articulated to the jury—was that the City had actual knowledge of such work because *all* plaintiffs had substantive work discussions with supervisors right after clocking in, before their shifts. But that was not an issue upon which the plaintiffs obtained a similarly-situated finding before trial. Thus, under this Court's precedent

2

in *Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502 (2d Cir. 2020), plaintiffs could not prove their actual knowledge theory by using representative evidence. And the evidence at trial made clear that countless plaintiffs could not prevail under an actual-knowledge theory: many admitted that they had no discussions with supervisors upon clocking in, did non-work activities after clocking in, and did no work in their supervisors' presence before their shifts.

And under *Scott*, plaintiffs could establish liability using representative evidence on only two issues: whether the City had a policy or practice of requiring out-of-shift work, and whether CityTime accurately recorded unpaid out-of-shift work. On both issues, plaintiffs plainly failed to offer sufficient evidence to support their pre-shift claims. The City never required pre-shift work; rather, plaintiffs routinely arrived right at their shifts' start and, on those days, were still able to be ready for their first call on time. And plaintiffs made no showing that CityTime somehow "recorded" time worked—much less that it did so in a manner that gave the City actual knowledge that plaintiffs were *working* the whole time that they were merely clocked in.

Plaintiffs submitted, and were granted, thousands of overtime requests each week. Yet they claim that the City overlooked about 30 minutes per month, per plaintiff, of compensable unpaid overtime they themselves failed to report. There is no evidence that the City must have known all plaintiffs were omitting this time from their numerous weekly overtime requests. For these reasons, there is also no sound basis for the jury's finding that the City was willful in failing to pay all plaintiffs for time they did not report, requiring reversal of the willfulness finding as well.

In any event, there must be a new trial on damages. The district court acknowledged that the key assumption underlying plaintiffs' expert's damages calculation was that "all minutes recorded by" the City's timekeeping system "represent compensable work time"—that is, all the time recorded was, under FLSA, actually time *worked*. There was ample evidence, including plaintiffs' admissions, disproving that assumption. But instead of letting the jury decide whether plaintiffs had proven up this key assumption, the court effectively took the question from the jury. The City is entitled to a new trial on damages where a

4

factfinder, not the court, determines the truthfulness of the key factual assumption underlying the damages award.

Finally, the liability finding as to *post*-shift work by EMTs must be vacated because it rested on an erroneous legal ruling that removed a crucial defense from the jury's consideration. The key post-shift task for EMTs was an equipment exchange that took only a couple minutes and only sometimes occurred during their shifts. Such brief tasks may well qualify as "de minimis" under FLSA. Despite triable issues as to this task's duration, regularity, and whether it could be easily and accurately recorded, the court improperly rejected the defense as a matter of law. The City is entitled to have a jury hear this defense.

## JURISDICTIONAL STATEMENT

The district court had federal question jurisdiction, under 28 U.S.C. § 1331, based on plaintiffs' claims under FLSA, including 29 U.S.C. § 207. Because this appeal is from a final judgment, this Court has appellate jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1. Was there legally insufficient collective-wide evidence of a pre-shift FLSA violation, and of willfulness of such a violation, where plaintiffs undisputedly failed to report their pre-shift work to the City, there is no evidence that the City had actual knowledge of pre-shift work for many plaintiffs, and the City did not require the work to be performed pre-shift?

2. Is a new trial necessary to address damages for all claims, where the district court gave the jury an inappropriate verdict sheet question and instruction on damages that effectively removed from the jury's consideration the key factual dispute underlying the plaintiffs' damages theory?

3. Is a new trial necessary to address liability for EMTs' alleged post-shift work where the district court improperly rejected the City's de minimis defense as a matter of law?

## STATEMENT OF THE CASE

### A. FLSA's guarantee of overtime pay and the parties' collective bargaining agreement that gives EMTs and paramedics even broader access to overtime

FLSA requires employers to compensate employees for work the employer "suffer[ed] or permit[ed]." 29 U.S.C. § 203(g). This generally means that the employer knew or should have known that work was being performed, but permitted it to be done without compensation. *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 361 (2d Cir. 2011).

Central to this appeal is what it means for a public employer to "suffer or permit" unpaid work where its employees were able and required to submit overtime requests through a simple electronic system, regularly sought and obtained overtime compensation through that system, but nonetheless failed to use that system to submit overtime requests for the allegedly unpaid work. The parties sharply disagree about whether a jury may impose liability under such circumstances. And they sharply disagree as to the proof necessary to sustain such a finding for all of the 2,519 plaintiffs whose daily routines, interactions with supervisors, and time-reporting practices varied greatly.

To ensure fair pay, the City has long agreed, via the governing collective bargaining agreement with plaintiffs' labor union, to provide overtime terms that are significantly more generous than what FLSA mandates. For example, FLSA generally requires time-and-a-half overtime pay only when an employee works more than 40 hours in a week. *See* 29 U.S.C. § 207(a)(1). In contrast, the parties' CBA requires overtime *any* time paramedics[1] or EMTs work more than their scheduled eight-hour shifts, regardless of whether they have done any other work that week (Joint Appendix ("A") 1928, 2090-91, 2096, 2838-39, 2918).

As part of their labor agreement regarding overtime, the parties also agreed—consistent with FLSA regulations—that time worked is to be rounded to the nearest 15 minutes before compensation is calculated (A2089, 2932-33). *See* 29 C.F.R. § 785.48(b). Because of this agreed-upon rounding rule, plaintiffs' damages theory excluded any instances where their allegedly unpaid work lasted seven minutes or less (A2409-10), as any overtime request would have been rounded down to zero (*see* A2089). On the other hand, any allegedly unpaid work of eight or more minutes

---

[1] Though "paramedic" can refer to higher-ranked personnel holding a paramedic license, in this brief we use the term "paramedic" to mean paramedics who were, like plaintiffs, below the rank of lieutenant.

8

would have been rounded up to 15 minutes (*see* A2089, 2408). Plaintiffs do not contest the propriety of these rounding rules.

## B. Plaintiffs' lawsuit under FLSA

Roughly 2,500 EMTs and paramedics filed this lawsuit in early 2013 claiming that the City and FDNY (collectively, "the City") had violated FLSA by failing to pay them for work they allegedly performed but never reported, in an overtime request or any other manner. In particular, plaintiffs alleged that they worked after clocking in at the station but before the start of their scheduled shifts, and also that they worked after the end of their shifts but before clocking out.

### 1. The court's pretrial finding that the plaintiffs were similarly situated in two discrete ways

Opting to pursue their case as a collective action rather than on a plaintiff-by-plaintiff basis, plaintiffs took the necessary step of moving, before trial, for a judicial finding that they were similarly situated in ways "material to the disposition of their claims," for which collective treatment would "facilitate the collective litigation of collective plaintiffs' claims." *Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 522 (2d Cir. 2020). Although plaintiffs seemed to believe, incorrectly, they could

9

proceed as a "collective" on all issues, the district court properly read their papers to seek collective treatment on three potential issues: whether the City had "a policy or practice requiring all Plaintiffs to perform pre- and post-shift work without compensation"; whether "the CityTime system accurately recorded all uncompensated pre- and post-shift work performed by Plaintiffs"; and whether "each Plaintiff's supervisor had actual or constructive knowledge of each Plaintiff's pre- and post-shift work" (Special Appendix ("SPA") 38-39).

The court found the plaintiffs similarly situated as to the first two questions, but not the third (SPA46). As to the third, determining supervisors' knowledge of each plaintiffs' unpaid work would require an "individualized inquiry" not amenable to collective treatment (SPA43).

### 2. The trial evidence regarding the City's time-reporting system and the overtime plaintiffs allegedly worked, but did not report

After the district court largely denied the parties' summary judgment motions (SPA27), the case proceeded to trial. The trial evidence relevant to this appeal is summarized below.

### a. The City's system for employees to report their time so that they could be fairly paid

The parties do not dispute certain facts about the CityTime system and timeclock data at the core of this lawsuit. Every EMS station has at least one time-scanner where employees scan in upon arrival and scan out when leaving (*see* A2585, 2919). It is generally at the station's entrance, for the convenience of employees (A2919).

The data gathered by the scanners, referred to as timeclock data, reflect when employees arrive at the station following their commute and when they depart the station at the end of the day (*see* A2098). The data are stored in an electronic reporting system called CityTime that EMTs, paramedics, and about 180,000 other City employees use to report their time on a weekly basis (*see* A1888, 2124, 2916).

In 2005, more than two thousand EMTs and paramedics put the City on notice that they wanted to be paid for pre-shift and post-shift work (*see* A1345, 2076). CityTime was still in development at that time, and was rolled out for EMTs and paramedics in 2009—about a year before the liability period here (*see* A2091-92). As explained below, CityTime has an overtime request function that enables workers to

11

request overtime for time worked outside their scheduled shifts—speaking to EMTs and paramedics' complaints in 2005.

CityTime uses timeclock data to automatically determine whether an employee arrived on time and stayed for their whole shift (*see* A1888, 2921, 2923). If so, CityTime records the full shift as "compensable" (*see* A2923). If the timeclock data indicate that the employee arrived late or left early, then the employee will not be paid for the time they were absent during their shift, unless they allocate leave to cover that time—consistent with the union's contractual agreement that there is no "grace period" to arrive late (A2035, 2921).

To avoid being late due to unpredictable commute times, many plaintiffs testified that they aimed—with varying success—to arrive before their shifts (*e.g.*, A1234-35, 1972). Every station had a kitchen, locker room, showers, and a lounge with a television, where employees were free to socialize or relax if they happened to arrive early (A1865, 2609-11, 2641).

The CityTime system is not programmed to presume employees were working simply because they are clocked in at the station. Instead, if an employee is clocked-in *and working* before or after their scheduled

shift, the employee can submit an overtime request for work performed during that time (*see* A1903-04, 2921-23). The process is simple: the employee enters an overtime request on CityTime that includes the start and end time for the work, an overtime "reason" code, and a brief "comment" describing the work (A1317-19). Reason codes include a "late call" (handling an emergency response beyond a shift's end), an extra shift, training, and a catch-all "other" code (A1317-19, 1909). Due to the agreed-upon rounding rules in the CBA, the minimum amount of requestable overtime is eight minutes (*see* A1932, 2089).

Employees submit their weekly timesheets and overtime requests through CityTime. By clicking an electronic checkbox, employees certify that the time reported "correctly represents [their] attendance and activities for the week"; that they "requested compensation for any time that [they] worked in excess of [their] scheduled hours;" and, finally, that "any time outside [their] scheduled hours" for which they did not request overtime "was time not worked" (A3904).

In addition to CityTime's weekly reminder for employees to accurately report their time and request overtime for any time worked outside their shifts (*e.g.*, A3904), FDNY also issued a written "operations

13

order" in 2014 that further explained the department's rules and expectations regarding overtime and on-shift work. A draft of this order was prepared in 2008, but it was not issued at that time (*see* A2386-87). The 2014 order reminded employees that certain activities—including many of the tasks plaintiffs seek compensation for here—should be "engaged in during the tour," not before or after (A2063; *see* A4914). The order instructed that employees could not engage in those tasks outside of scheduled shifts without a supervisor's authorization (A4914).

The 2014 order also instructed supervisors to "periodically" observe EMTs and paramedics in the station to help confirm that no pre-shift work was being performed without authorization (A2065, 4915). If a supervisor observed pre-shift work, the supervisor was supposed to tell the worker to stop, ascertain how much time had been worked and ensure the time was reported in CityTime, and warn the employee not do it again (A4915). Plaintiffs testified that their supervisors rarely, if ever, did these spot-checks (*e.g.*, A1343).

### b. Plaintiffs' testimony about the tasks they allegedly performed but for which they failed to request overtime

Thirteen plaintiffs—out of 2,519 total—testified at trial. They testified about tasks they allegedly performed before and after their scheduled shifts for which they did not request overtime. As detailed below, their testimony varied greatly as to, among other things, the duration and regularity of the pre- and post-shift tasks and the extent to which the tasks took place within the presence of a supervisor.

### i. The start of plaintiffs' tours

The testifying plaintiffs identified two key timing requirements associated with the start of their tours. First, they needed to report for duty, in uniform, at the start of their scheduled shifts (*see* A2786-87, 2894). Second, they needed to log on to their ambulance computers within 10 minutes after the start of their shifts (A1471 (lieutenant's testimony that the time limit was 10 minutes)). Plaintiffs' pre-shift claims rest on their contentions that (1) they typically performed six or seven work tasks, detailed below, before logging in to the ambulance computer; (2) they often performed three or four of these tasks before the start of

15

their shifts; and (3) their pre-shift time was unpaid. It is undisputed plaintiffs did not request overtime for this pre-shift time.

Plaintiffs had different understandings of exactly how long they could take, after the start of their shifts, to log on to their ambulance computers (*see* A1289 (10 minutes); A1598 (five minutes); A1676 (five minutes); A1537-38 (as soon as possible)). The average log-on time for some of the testifying plaintiffs was about seven to nine minutes (*e.g.*, A1333-34, 1764-66, 2368). The average log-on time for one borough's stations was 13 to 14 minutes (A2697).

There is scant evidence in the record about how long any given plaintiff worked between arriving at the station and logging on to the ambulance computer. None of the testifying plaintiffs estimated how long their pre-log-in tasks, described below, took them in total. But there is no dispute that plaintiffs routinely arrived right at the start of their shifts (*see*, *e.g.*, A1344, 1362, 1769-71, 2503, 2552-53, 2742-46, 2796, 2799, 2882, 2887-88), and that, on those days, they were able to log on to the ambulance computers in a timely manner and faced no reprimand or discipline for arriving right as their shifts started.

The 13 testifying plaintiffs differed as to when, after arriving at the station, they first started working in a supervisor's presence. One plaintiff explained that, after clocking in, he would go directly to the locker room to put on his uniform, without speaking with his supervisor (A2782-83, 2806; *see also* A1447). Another two plaintiffs simply said "hi" to the supervisor, or let the supervisor "know [they were] there," before heading to the locker room (A2502, 2567-68, 2885). Of the 10 other testifying plaintiffs, most checked in with the supervisor right after clocking in (*e.g.*, A1263-64, 1668-69, 1748), or did so some of the time (*e.g.*, A1419, 1748).

Plaintiffs testified that they generally performed eight tasks prior to logging on to the ambulance computer:

1. they put on their uniforms;

2. they got their personal equipment (duty belt, radio strap, stethoscope, scissors) from their lockers;

3. they got their personal protective equipment (PPE) and performed some level of "check" of that equipment;

4. EMTs got their tech bag and performed some level of "check" of the bag's contents;

5. they spoke to the lieutenant and/or the outgoing tour about their upcoming shift and any information they should know;

17

6.  they got the shared equipment (keys, radio, measurement meters, EpiPen) from the outgoing tour, logged it, and replaced the radio battery;

7.  paramedics got the narcotics pouch (Diazepam, morphine, Versid, fentanyl) from the outgoing tour, checked it, and logged it; and

8.  they checked the ambulance to make sure it was ready to go

(*see, e.g.*, A1533-36, 1584-87, 1602-03, 1945-47, 2003-07).

Only the second through fifth tasks are part of plaintiffs' pre-shift claims. Plaintiffs admit that getting dressed does not constitute "work" (*see* A2041); indeed, plaintiffs were permitted to, and some did, get dressed at home before commuting (A2501, 2640-41). And the final three tasks listed above—obtaining equipment and narcotics from the outgoing tour, and checking the ambulance—almost always took place *after* the shift's start: these tasks generally could not happen until the prior shift was over and the outgoing tour was present to hand over equipment and narcotics (*see* A1278-81, 1286, 1288-89, 1292).

Tasks two through five listed above—getting information from the lieutenant, checking PPE, checking personal equipment, and, for EMTs only, checking tech bags—form the core of plaintiffs' pre-shift claims. The testifying plaintiffs varied as to how long these tasks took and how often,

18

if ever, they performed them before their shifts (*e.g.*, A1565-67). One plaintiff testified that, in total, these tasks took 8 to 10 minutes (A2595).

Multiple testifying plaintiffs admitted that they sometimes performed these tasks, if at all, *during* their shifts. Nearly all the testifying plaintiffs admitted that they sometimes arrived at, or just before, the start of their scheduled shifts (*e.g.*, A1344, 1362, 1769-71, 2503, 2552-53, 2742-46, 2796, 2799, 2882, 2887-88)—and, thus, could not do any of these tasks before the start of their shifts on those days.

Some plaintiffs admitted that they never did some of these tasks, such as checking their PPE, before their shifts (*e.g.*, A1817-19), or that they sometimes did not do them (A1357, 1784-85, 2505-06, 2510). Plaintiffs conceded they were not disciplined or reprimanded for performing these tasks during their shifts (*e.g.*, A2516-17). And they admitted that none of these tasks were required to occur before their shifts (*e.g.*, A1371, 1784-85). Indeed, plaintiffs' counsel conceded this point during summation: after saying plaintiffs "ha[d] to" arrive early, she immediately corrected herself and explained that it's not "required," but, rather, "they're *allowed to* come in early and do work" (A3195).

In short, plaintiffs' pre-shift claims are about work they sometimes chose to perform before their shifts because, according to some plaintiffs, doing that work before their shifts made their days less hectic (*e.g.*, A1695-96). It is undisputed that, except for checking in with a supervisor, all the alleged pre-shift work typically occurred without any supervisor present. And as explained above, many of the testifying plaintiffs did not speak with their supervisors about work at all before their shifts started (*see* A1447, 2501, 2783, 2806, 2885).

Some plaintiffs received praise in their annual evaluations for arriving early to the station (*e.g.*, A2371-72). But of the scores of evaluations plaintiffs offered at trial (A4918-5137), only two recognized an employee for actually *working* before their shift (*see* A2374, 2375), as opposed to merely arriving early to avoid being late or to ensure they were in uniform by the start of their shift (*cf.* A2371-72, 4920).

### ii.  The end of plaintiffs' tours

Plaintiffs also testified about work they allegedly performed after the end of their scheduled shifts. The post-shift work they described was different for paramedics (who handle narcotics) and EMTs (who do not),

and its timing depended on whether the employee's shift ended on time, early, or late.

Plaintiffs testified that, if there was no late call, they would start driving back to the station up to 15 minutes before the end of the shift (*see* A1296-97, 1757-58).[2] They remained on call, and in their ambulance, until their shift ended (A1287). If they did not receive an emergency call, then at their shift's end they would go into the station to exchange equipment with the oncoming tour (*see* A1297-98, 1460-62). They would tell the oncoming employees any pertinent information—*e.g.*, road closures or hospital capacity issues—at the same time (*see* A1297-98, 1679). If there was no oncoming tour, they would leave the equipment with the lieutenant (A2772-73).

This equipment and information exchange differed significantly between paramedics and EMTs, because the paramedics also had to transfer and log a narcotics pouch (*see* A2239). The narcotics transfer was an involved process that took place in the presence of a supervisor (*see*

---

[2] During their shifts, EMTs and paramedics generally waited for calls in their ambulances near assigned intersections (A2647-48).

A1344, 1545, 2241, 2584). The City is not contesting liability for paramedics' post-shift work on this appeal.

As for EMTs, the equipment transfer was the main task underlying their post-shift claims (*see* A1298, 1758-59). But by many accounts, this transfer took only two minutes (A2789 (took "about two minutes"); A2904 (took "like two minutes, maybe"); *see also* A1643 (could take "just a minute")). At the end of a shift, an EMT simply had to "give back their radio and tablet and things like that," or leave it on the lieutenant's desk, without doing any paperwork (A1506-07; *accord* A2643). The EMTs coming on duty, whose shifts had just begun, documented the transfer (A1506, 2643).

The equipment transfer sometimes took place during a plaintiff's shift (*e.g.*, A1363-64, 1423-24). That typically happened if a plaintiff's tour ended early, due the plaintiff's partner needing to go off duty before the plaintiff's shift ended (*see* A1423-24, 1651). On these days, the plaintiff usually conducted the exchange during the scheduled shift, and clocked out right at the end of the shift (*see* A1363).

But that was not the only situation when plaintiffs were compensated for equipment exchanges. Many, if not most, of plaintiffs'

shifts ended with a late call—an emergency response that concluded after the end of a shift (*see* A1508, 1678-79, 1683). There is no dispute that overtime for late calls was requested and paid; late-call overtime is not part of this lawsuit (A1199-1200). And plaintiffs admitted that when they had late calls, they requested and received overtime compensating them for *all* tasks they performed during and after the late calls, including equipment exchanges (*e.g.*, A1318-19, 1647, 2792-93).

### c. Plaintiffs' 1.7 million overtime requests granted during the time period at issue

While this lawsuit concerns only out-of-shift time that plaintiffs failed to report as time worked, plaintiffs routinely sought and received overtime compensation for out-of-shift work. Plaintiffs made, and were paid for, approximately 1.7 million overtime requests during the time period covered by this lawsuit (A2972). Nearly 390 million minutes of overtime were granted, yielding more than $150 million in overtime payments to plaintiffs (A2996-98). Plaintiffs' expert did not dispute these tallies (*see* A2429).

Plaintiffs' overtime requests were granted more than 98% of the time (A2972). These granted overtime requests included requests

regarding exactly the types of tasks at issue in this lawsuit. Plaintiff Edwin Gonzalez, who submitted more than 1,000 overtime requests, testified that he requested and was paid overtime for a broad range of tasks performed outside his shift, including securing equipment and PPE (A1995). Before the City added a specific overtime code for narcotics securements, Plaintiff Anson was approved for overtime for such work using the catch-all "other" code (A1388-96, 1429).

Chaz Perry, the lead plaintiff and a union delegate, made and was granted overtime requests for the types of tasks at issue—such as post-shift exchanges—as early as 2012 (A2042-45). He told his co-workers that if they were working beyond their shift they "absolutely should be submitting [overtime requests] for it" (A2055-56). He believed that they followed his advice (A2056). And he believed such requests were allowed, so long as the work took at least 10 minutes (*see* A2055-57).

Another plaintiff, Jessica Cruz, testified that she requested overtime for any post-shift activities that took more than 10 minutes, including many of the tasks at issue (A2496-97; *see also* A2520). She made such requests as far back as 2011 (*see* A2498, 2557). No supervisor ever told her not to submit such requests (A2498).

24

Indeed, refusals of overtime requests were exceedingly rare. Plaintiff Janet Bentkowski never had a single overtime request rejected during her 27-year career (A1646). Plaintiff Jamil Perez only ever had one request denied (A1561). Lieutenant Jose Gonzalez testified that, in nearly 15 years as a lieutenant, he denied just one or two requests (A1509). Deputy Chief Norman Ortiz rejected only one request, from an employee who had been watching TV at the time (A1853).

Plaintiffs admitted that, although almost all their overtime requests were granted, they never submitted overtime requests for the time they now claim went unpaid (*e.g.*, A1319-20, 1544-45). Some of them testified that they failed to submit such requests because they believed, or had heard or been "told," that such requests would have been denied (A1545, 1556, 1949). Others testified that they did not submit such requests because there was no specific overtime code available for the tasks in question (*e.g.*, A1319-20, 1810, 1949).

But many plaintiffs admitted that they had submitted, and were paid for, overtime requests under the "other" category, which could be selected for any request that did not fall under a more specific category (A1389, 2493-94; *see also* A1988-90 (one could also use "administrative"

25

code instead of "other")). Some plaintiffs claimed they were unaware they could use the "other" code (A1561-62).

The City's expert identified about 340,000 instances of pre-shift overtime that were approved during the relevant time period (A2973). Plaintiffs' expert, looking at a narrower five-year period, identified more than 150,000 occasions of approved pre-shift overtime (A2459).

### d. Plaintiffs' damages theory and calculations

Plaintiffs' lead damages theory rested on a crucial assumption: for up to 15 minutes before and after their paid time, *all* of their time spent clocked-in at the station, but not reported as overtime, was "time worked" (A2437-38). In calculating damages, plaintiffs' expert simply assumed that the plaintiffs "were working" during that time (A2447). He had "no idea" how plaintiffs' counsel arrived at that assumption, but adopted it because counsel "implicitly" instructed him to (A2447).

Plaintiffs' expert testified that, based on this assumption, he calculated how much unpaid time plaintiffs "worked" before or after their shifts (*see* A2437-38). He excluded time periods of seven minutes or less, consistent with the parties' CBA (A2409-10). He also testified that his intent was to calculate no damages for weeks where a plaintiff worked

26

fewer than 40 hours, because FLSA does not allow such damages (A2414, 2431). But when shown examples where his calculations did precisely that, he did not deny the discrepancy (*see* A2433-36).

The damages calculated by plaintiffs' expert totaled $5.34 per plaintiff per week during a representative six-month period (A2421). That is the only weekly damages figure he testified to (*see id.*). Based on the overtime pay rate of $40.26/hour that he used for his calculations (A2424), this weekly damages figure of $5.34 per plaintiff represented just 0.13 hours, or 8 minutes, of unpaid overtime per plaintiff per week.

Plaintiffs' expert's calculations ultimately totaled $6.2 million in overtime (A1212, 2421). Plaintiffs' expert confirmed that his calculation included damages for post-overtime time—that is, damages for time spent at the station immediately *following* a period of paid overtime (A2450-56). For example, a testifying plaintiff requested and was paid for 11.5 hours of overtime and then, after the conclusion of that paid overtime, she remained at the station for nine minutes for which she did not request overtime (A2451-52). The expert assumed she was working, and entitled to, damages for that post-overtime time, even though she did not include it in her overtime request (A2451-53). The expert included

27

such damages (rounded to the nearest 15 minutes) any time a plaintiff was at the station following overtime they requested and were paid (*see* A2454-55, 2460-61).

### 3. The jury charge, the jury's voiced confusion about the verdict sheet during deliberations, and the verdict

Two portions of the jury charge and verdict sheet are relevant to this appeal. The first relates to the City's de minimis defense, under which tasks that take "only a few seconds or minutes" beyond a scheduled shift may be "disregarded" by the jury in assessing FLSA liability. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692 (1946). The court directed the jury that it could not find the time spent on EMTs' post-shift equipment exchange to be de minimis.

The rationale for that instruction was that, in its earlier order largely denying the parties' summary judgment motions, the court had rejected as a matter of law the City's defense that the EMTs' post-shift equipment exchange was de minimis (A3101; SPA10 n.5). In opposing summary judgment, the City had argued that this time was de minimis (SDNY ECF No. 150, at 25-26); indeed, according to plaintiffs' own papers, the task took only 2 to 3 minutes (SDNY ECF No. 135-1, at 26).

28

On summary judgment, the court rejected the defense as a matter of law, in a short footnote. The court first recited plaintiffs' argument that they "spend up to six minutes per day on the exchange of equipment alone" (SPA10 n.5 (citing Plaintiffs' Reply Memorandum at 9)). That six-minute figure was based on paramedics' *narcotics* exchange, not EMTs' brief equipment exchange (SDNY ECF No. 135-1, at 26). The court then simply concluded that "the time spent on exchanging equipment or narcotics is not de minimis since such time can [be] or is recorded in CityTime, the exchanges can take several minutes, and occur regularly" (SPA10 n.5). The court thus barred the jury from considering this defense for the EMTs' equipment exchange (A3101, 3255).

Second, the court asked the jury to answer a single threshold damages question which, if answered affirmatively, was supposed to yield the court's adoption of plaintiffs' expert's damages calculations (*see* A3259-60). As explained above, the key assumption underlying plaintiffs' expert's damages calculation was that, for the 15 minutes before and after plaintiffs' paid time, *all* the time during which they were clocked in was time "worked" (A2437-38, 2447)—that is, that "all minutes recorded by the [CityTime] system represent compensable work time" (SPA133-

34). But the court did not ask the jury to resolve whether plaintiffs had proven up *that* assumption (A3279-81).

Instead, the court asked the jury only whether plaintiffs had proven, by a preponderance of the evidence, that CityTime "accurately captures the unpaid pre-shift work minutes at issue in this case (i.e., up to 15 minutes of pre-shift work)" (A3280). The court then asked an identical question for post-shift time (*id.*). If the jury answered these two questions affirmatively, they were to skip further questions asking them to calculate damages directly (A3281).

Unsurprisingly, the jury was confused by the threshold damages questions. During deliberations they specifically asked for "clarification" as to their meaning (A3268). In particular, they recognized two different ways to interpret the questions, which they spelled out for the court in their note.

Under the first possible interpretation, the jury would answer "whether the CityTime system documentation of preshift work time should all be considered work time" (A3268). In other words, they would have decided the appropriateness of the key factual assumption underlying plaintiffs' expert's damages calculation. Under the second

30

possible reading, though, the jury would simply decide whether "the preshift work time in question is accurately captured in CityTime" (*id.*)—regardless of whether some of the time reflected was time not worked. Over the City's objection, the court instructed the jury that the second reading was the correct one (A3269-72).

The jury swiftly answered yes to that question. In addition, they concluded that the City had a policy and practice of suffering or permitting plaintiffs to perform unpaid work before and after their shifts, and that the City's violation of FLSA was willful (A3279-81).

### 4. Post-trial proceedings

Post-verdict, the court held that the jury's willfulness finding foreclosed a showing of good faith by the City and thus, under 29 U.S.C. §§ 216 and 260, the court awarded statutory damages equaling 100% of the backpay award (SPA60). The court then entered judgment in the amount of $7.2 million in backpay, $7.2 million in statutory damages, and $3.3 million in attorneys' fees (SPA63).

The City moved, under Rule 50 and 59, for judgment as a matter of law or a new trial. As relevant here, the City argued that the evidence was legally insufficient to establish that it violated FLSA or did so

31

willfully; the court erred in refusing to let the jury consider whether EMTs' equipment exchange was de minimis; and a new damages trial was necessary because the court's instructions and verdict sheet were misleading and incorrect (SDNY ECF No. 319, at 2-11, 32-40).

The district court denied that motion in its entirety (SPA134). Acknowledging the City had no formal policy of permitting unpaid work, the court found the trial evidence legally sufficient to support the liability and willfulness findings (SPA114-19).

The court then denied the City's request for a new trial. As to the de minimis defense, the court held that it had properly forbidden the jury from considering that defense for the EMTs' equipment exchange because that question had been resolved on summary judgment and the court had no obligation to reconsider it post-trial (SPA130-31).

As to the request for a new damages trial, the court appeared to conclude that the jury's affirmative answer to the verdict sheet questions on damages "adequately" reflected that "all minutes recorded by the [CityTime] system represent compensable work time" (SPA133-34). The court did not explain how that could be the case when the court had specifically instructed the jury *not* to consider that factual question in

32

response to the jury's question during deliberations. Instead, the court posited that there was "insufficient record evidence to indicate that a substantial amount of pre-shift time recorded in CityTime as non-compensable time was, in fact, improperly designated" (SPA134).

## STANDARD OF REVIEW AND
## SUMMARY OF ARGUMENT

*First*, the district court erred in denying the City's motion for a judgment of matter of law regarding FLSA liability for pre-shift work. That denial is reviewed de novo. *Warren v. Pataki*, 823 F.3d 125, 137 (2d Cir. 2016). This Court must grant judgment as a matter of law for the City if, "with credibility assessments made against the moving party and all inferences drawn against the moving party," a reasonable juror would have been "compelled to accept" the City's position. *Id.* at 139.

The City is entitled to judgment as a matter of law on plaintiffs' pre-shift work claims. As other circuit courts have acknowledged, an employer should be entitled to rely on the accuracy of its employees' reports of their time worked, so long as the employer lacked actual knowledge of unpaid work and did not require such work during unpaid time. An employer is not liable for time that employees could have, but failed to, report as overtime using available reporting mechanisms. This

Court should adopt that bright-line rule, and hold that the City is not liable for plaintiffs' pre-shift work because it lacked actual knowledge of plaintiffs' unreported, unrequired work on a collective-wide basis.

Alternatively, even absent that bright-line rule, the City is entitled to judgment as a matter of law on this claim because plaintiffs failed to prove liability for pre-shift work on a collective-wide basis. For this claim, the district court's pre-trial similarly-situated finding permitted representative proof only as to whether the City required pre-shift work and whether CityTime accurately "recorded" unpaid work. The representative evidence on those discrete points was legally insufficient to establish FLSA liability, as a matter of law.

Pre-shift work was not required. Plaintiffs often arrived right at the start of their shifts and never received any reprimand or discipline for doing so; and on those days they arrived at the start of their shifts, they were able to get ready for their tour and log onto their ambulance without doing any pre-shift work. The City reasonably concluded that plaintiffs had not requested overtime for pre-shift work because they had not performed work before their shift. Plaintiffs could not backfill that evidentiary deficiency on a collective-wide basis with limited and

34

scattershot evidence that some supervisors witnessed pre-shift work for some plaintiffs, but not others, as the court recognized when it forbade collective proof of supervisors' knowledge.

At the very least, the City did not willfully underpay its employees for pre-shift time they failed to report as time worked. It was reasonable—and certainly not reckless—for the City to conclude, in the absence of any overtime request, that plaintiffs were not performing compensable unpaid work before their shifts without reporting it. City lawyers specifically advised the City that it could require employees to request overtime for non-shift work, and the City reasonably relied on such advice.

*Second*, the City is entitled to a new trial on damages because the court incorrectly instructed the jury as to damages. This error is reviewed de novo, *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994). An erroneous instruction, unless harmless, requires a new trial. *Id.*

Here, the district court deprived the jury of the ability to decide the core factual dispute at the foundation of plaintiffs' expert's damages calculation—that is, whether "all minutes recorded by" the City's timekeeping system "represent compensable work time." The court

35

instead asked the jury a different, misleading, and irrelevant factual question. The court then adopted plaintiffs' expert's damages calculation based on the answer to *that* question, and the jury never decided whether the evidence supported the key assumption underlying the expert's methodology. By taking that key factual question out of the jury's hands despite ample competing evidence, the court erred.

*Finally*, a new trial is necessary on the EMTs' claim for post-shift overtime. The district court incorrectly granted summary judgment for plaintiffs, and instructed the jury not to consider, the City's de minimis defense as it related to EMTs' post-shift equipment transfer. Removing this critical defense from the jury's consideration prejudiced the City. This error is reviewed de novo. *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 533 (2d Cir. 2015) (grant of partial summary judgment reviewed de novo); *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 146 (2d Cir. 2010) (jury charge reviewed de novo).

# ARGUMENT

## POINT I

## PLAINTIFFS FAILED TO PROVE LIABILITY FOR THEIR ALLEGED PRE-SHIFT WORK

Plaintiffs failed to establish the City's liability for their alleged pre-shift work. To be clear, plaintiffs failed to request overtime for *any* of the alleged work underlying their pre-shift claims, even though a readily available electronic timekeeping system allowed them to do exactly that. This Court should join other circuits in adopting a bright-line rule recognizing that an employer can be held liable for employees' unreported work only if a plaintiff establishes that the employer either (a) required the work to be performed outside employees' regular hours, or (b) had actual knowledge that unpaid work was being performed outside employees' regular hours. Absent either of those showings, the employer should be found to lack knowledge of the unreported work, as a matter of law. Here, plaintiffs made neither showing at trial.

Indeed, regardless of that bright-line defense for employers who rely on their employees' reported time, no reasonable jury could conclude on this record that the City had constructive knowledge of plaintiffs' alleged pre-shift work on a collective-wide basis. And there certainly was

not legally sufficient evidence to find that the City willfully violated the law in connection with plaintiffs' pre-shift claims.

### A. The City is not liable for work that plaintiffs failed to report using CityTime, where the City neither required the work to be done outside regular hours nor actually knew about such off-shift work.

As other circuits have recognized, FLSA does not compel compensation for work that an employer has not required employees to perform outside regular hours and employees have failed to report to the employer by, for example, submitting an overtime request through a readily available timekeeping system.[3] The Fifth, Sixth, Eighth, and Ninth Circuits have all "expressly declined to place the onus on employers to ferret out work that is not reported under its reasonable procedures." *Gordon v. Kaleida Health*, 299 F.R.D. 380, 396 (W.D.N.Y. 2014) (citing *Hertz v. Woodbury Cty.*, 566 F.3d 775, 784 (8th Cir. 2009); *Newton v. City of Henderson*, 47 F.3d 746, 749-50 (5th Cir. 1995); *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981); and *White v. Baptist Mem'l Health Care*, 699 F.3d 869, 876 (6th

---

[3] Although FLSA requires employers to keep accurate records of time worked, 29 U.S.C. § 211(c), this Court has recognized that this obligation only extends to work that the employer knows about, or has reason to know about. *Kuebel*, 643 F.3d at 363.

38

Cir. 2012)). Those courts have sensibly rejected claims where an employee had available avenues to report unpaid off-shift work, the employee failed to use those avenues, and the employer lacked actual knowledge of the alleged unpaid work. *See Newton*, 47 F.3d at 749-50; *Forrester*, 646 F.2d at 414; *White*, 699 F.3d at 876.

This Court should adopt the same bright-line rule, holding that no liability arises when an employee is able but fails to request overtime through a readily available timekeeping system unless the employer either (a) requires the work to be performed outside regular hours, or (b) has actual knowledge that such off-shift work is being performed unpaid. And under that approach, plaintiffs' pre-shift claims fail as a matter of law.

### 1. The City did not require plaintiffs to perform the work at issue outside regular hours.

Plaintiffs failed to establish that the City required them to do the pre-shift work at issue without compensation and without reporting it via CityTime. On the contrary, many plaintiffs often arrived right at the start of their shifts. There was no requirement that plaintiffs arrive even a single minute before their shifts (*e.g.*, A1493). They uniformly testified

that they were never reprimanded or disciplined for arriving right on time (*e.g.*, A1706, 1973-74, 2884-85). This proves, quite simply, that they were not required to arrive early, nor to do any work before their shifts started.

Indeed, because the trial evidence flatly disproved any plausible inference that plaintiffs were *required* to do pre-shift work, their counsel specifically conceded the point during summation. After mistakenly saying plaintiffs "ha[d] to" arrive early, she immediately corrected herself and explained that arriving early was not "required," but, rather, the plaintiffs were simply "allowed to" come in early (A3195).

That admission fully comports with any sound reading of the trial evidence. Some plaintiffs testified that their days were less hectic if they arrived early and performed tasks such as checking their PPE. But they often arrived at, or right before, their shifts started (*e.g.*, A1344, 1362, 1769-71, 2503, 2552-53, 2742-46, 2796, 2799, 2882, 2887-88). They also admitted that there was no requirement of checking gear before a shift (*e.g.*, A1371) and, further, that they were constantly checking their gear throughout their previous shift, so it would be ready at the start of the next shift without any pre-shift work (*e.g.*, A1360; *see also* A1854-55).

40

For that reason, no pre-shift work was *required* for them to meet the requirement that they report for duty, at the start of their tours, in uniform and with their equipment ready (A4823). All they had to do was pick up their equipment bags from the gear rack outside the lieutenant's office. And as noted above, they were able to meet this requirement to the satisfaction of their supervisors—without ever receiving any reprimand or discipline—even on those days when they arrived right at the start of their shifts.

### 2. The City did not actually know plaintiffs were performing unpaid work pre-shift.

Plaintiffs also failed to establish that the City had actual knowledge that they were performing work before their scheduled shifts and were not being compensated for such work. On the most fundamental level, the City undeniably had a practice of *paying* overtime nearly every time plaintiffs requested it. During the liability period, plaintiffs made 1.7 million overtime requests and the City granted nearly all of them, denying under 2%, yielding $150 million in payments to plaintiffs. The average plaintiff had about 660 overtime requests granted and only 13 denied. Against this backdrop, plaintiffs had an especially heavy burden

41

of showing that the City knew they were sporadically performing off-shift work that was not captured within their numerous overtime requests.

Nor did plaintiffs establish that individual, site-specific supervisors had actual knowledge of unpaid, pre-shift work. As an initial matter, plaintiffs were not allowed to use representative evidence to prove supervisors' knowledge of such work on a collective-wide basis, as the district court's similarly-situated findings did not reach so far[4] (SPA43, 46). *See Scott*, 954 F.3d at 522 (collective treatment is appropriate only "to [the] extent" plaintiffs have been found similarly situated). And they certainly did not prove actual knowledge for each individual plaintiff.

In their opening statement to the jury, plaintiffs made clear the theory under which they planned to establish actual knowledge of unpaid pre-shift work. Plaintiffs told the jury that the evidence would show that, upon arriving to the station each day, plaintiffs clocked in using a scanner "right outside of the lieutenant's office" and then, right after scanning in, "check[ed] in with the lieutenant" about their work

---

[4] The only issues plaintiffs were permitted to prove on a collective basis, using representative evidence, were whether the City had a policy or practice of *requiring* out-of-shift work, and whether CityTime accurately recorded unpaid work (SPA43, 46).

assignments (A1190-91). This sequence of events was a critical piece of plaintiffs' strategy at trial: under the "continuous workday" doctrine, if plaintiffs could prove that each plaintiff engaged in a "principal activity" of employment immediately after clocking in, then all the time that followed would be deemed time worked too. *See Kuebel*, 643 F.3d at 359.

But the trial evidence was plainly insufficient to show supervisors' actual knowledge of each plaintiff's pre-shift work. Only thirteen of out 2,519 plaintiffs even testified. Multiple testifying plaintiffs made clear that they did not discuss work with the lieutenant right after scanning in, but instead went to the locker room and reported to the lieutenant only at the start of their shifts (A2501, 2783, 2806, 2885). For these plaintiffs, the supervisors had no actual knowledge of whether plaintiffs were working from the moment they clocked in.

Plaintiffs' proof was insufficient even as to those 10 testifying plaintiffs who typically "checked in" with their lieutenants right after clocking in. Some admittedly did not always speak to their lieutenants pre-shift (*e.g.*, A1419, 1747-48), while others failed to establish that they were engaged in compensable "work" during that brief check-in. Some admitted that they checked in to satisfy their personal curiosity about

43

who they would be partnered with (A2806). Such a personal inquiry is neither integral nor indispensable to emergency services work, *see Integrity Staffing Solutions, Inc. v. Busk*, 574 U.S. 27, 33 (2015), and thus could not trigger the continuous workday rule. *See Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 590 (2d Cir. 2007); 29 C.F.R. § 790.8.

Simply put, when it came to actual knowledge of pre-shift work, plaintiffs failed to prove their case as a matter of law. They were not permitted to prove supervisory knowledge using representative evidence (*see* SPA43, 46) and, even if that were not the case, there was no evidence that the 2,519 plaintiffs in this collective action matched the purportedly prototypical plaintiff that their counsel described so clearly to the jury— an employee who, upon clocking in, immediately went to the lieutenant's office to engage in work that was integral and indispensable to the primary activities of their employment.

### 3. There is no legitimate basis for disregarding the City's system for reporting overtime, much less on a collective-wide basis.

To be sure, courts have recognized a narrow exception to the bright-line rule when an employer's own conduct renders an overtime request futile, such as if the employer unambiguously tells the employees that it

44

will "not pay overtime." *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1321 (11th Cir. 2007). But there is no evidence of such conduct here. While some plaintiffs testified that they did not think they were allowed to request overtime for the pre-shift work at issue here, none testified that they were instructed not to request overtime for such work and none testified that they ever requested and were denied overtime for such work. To the contrary, the City's undisputed practice was to grant millions of overtime requests and deny under 2%. *See Hertz*, 566 F.3d at 783 (no liability where, inter alia, employer had an "established procedure for overtime claims that Plaintiffs regularly used").

Plaintiffs undisputedly could have submitted, but failed to submit, overtime requests for their alleged pre-shift work. They all knew how to submit overtime requests and did so regularly. Lead plaintiff Perry told his co-workers that they "absolutely should be submitting" overtime requests for work outside their shifts (A2055-56).

And it makes no difference, in this case, whether this Court follows the Seventh Circuit's unworkable dicta suggesting that an employer who "discourages" the use of an established time-reporting system should be treated the same as an employer who actually *prevents* its use. *See Allen*

45

*v. City of Chicago*, 865 F.3d 936, 939 (7th Cir. 2017). No reasonable juror could conclude that the City prevented *or discouraged* plaintiffs from the simple act of documenting their unpaid work by submitting overtime requests. No plaintiff identified a single time they were reprimanded, or even warned, for submitting an overtime request. Plaintiffs failed to identify a single person, much less a decisionmaker, who told them not to submit overtime requests or informed them that pre-shift requests would be denied. In the absence of such evidence, FLSA imposes no liability on public employers for unreported work they did not require.

Plaintiffs' contrary, overbroad reading of the law would yield "perverse" results, *Hertz*, 566 F.3d at 784, requiring the City to reject plaintiffs' self-reported time and instead divine that, in addition to plaintiffs' *thousands* of weekly overtime requests that the City approved, plaintiffs also worked but failed to report roughly two unreported 15-minute periods per month per plaintiff. But the law in this area requires only reasonable diligence, not omniscience. *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 389 (6th Cir. 2016).

That insight applies to special force when it comes to public employers like the City. Public employers are bound by a fundamentally

46

different set of financial, legal, and political constraints than for-profit companies. They serve the public. They strive to operate efficiently, avoiding fraud and waste. They draw their funds from the same budgets that must also address numerous other societal needs. To meet these critical goals, public employers must take care not to waste tax dollars by overpaying employees for work not needed or work not performed. Public employers have a duty, to the entire community, not to waste public funds on such expenses. *See, e.g.*, *Boyd v. Collins*, 11 N.Y.2d 228, 233-34 (1962).

Tasks like these—ones that are not required to be performed off-hours or can be done during regular paid time—are precisely the kind of work that a public employer should not be compelled to pay overtime for in the absence of any overtime request. A public employer should not presume work is being done, and pay for that work with taxpayers' money, if the work was neither required by the employer nor reported by the employee. Proactively paying for such unreported work wastes public resources. Such a practice should not be required.

Plaintiffs' reading of the law also expects lieutenants—City employees charged with ensuring prompt emergency response for New

Yorkers in distress—to allocate precious time, near crucial shift transitions, roaming the hallways trying to guess whether employees are both performing pre-shift work of at least eight minutes (to satisfy the CBA's rounding provisions) and failing to request overtime for such work (*see* A1343). Even though FDNY proactively asked lieutenants to "periodically" conduct such spot-checks in 2014 (*see* A4915), universal, minute-by-minute surveillance of each employee's workday is neither practical nor desirable where the employer has made a simple electronic time-reporting system available.

For all of these reasons, a public employer should face no FLSA liability where it provided a mechanism for reporting time worked that its public employees were required to use, did in fact use on a weekly basis, but failed to use to report their alleged out-of-shift, unrequired work. Because those are the circumstances here, plaintiffs' pre-shift claims fail as a matter of law.

**B. Even assuming constructive knowledge matters, plaintiffs failed to prove that the City had constructive knowledge of their unpaid pre-shift work on a collective-wide basis.**

When it comes to plaintiffs' pre-shift claims, the Court could stop there, because constructive knowledge is an insufficient basis to impose liability where, as here, an employee fails to request overtime through an available timekeeping system, the employer has not required the work to be done outside regular hours, and the employer does not actually know that such work is being done outside regular hours without compensation. But even assuming for the sake of argument that constructive knowledge remains relevant, plaintiffs' proof of constructive knowledge was insufficient as a matter of law.

Again, the district court's similarly situated findings on two discrete grounds did not authorize plaintiffs to use representative evidence to establish constructive knowledge on a collective-wide basis (SPA43, 46). *See Scott*, 954 F.3d at 522 (collective treatment is appropriate only "to [the] extent" plaintiffs have been found similarly situated). So, for example, plaintiffs could not satisfy their burden simply by pointing to a tiny number of cherry-picked performance evaluations arguably praising pre-shift work as evidence that all plaintiffs were

49

"encouraged" to do pre-shift work and thus the City should have known about it.

And even if that did not defeat plaintiffs' claims as a matter of law, other trial evidence clearly confirmed the City's lack of constructive knowledge. Indeed, by plaintiffs' expert's own account, the plaintiffs were entitled to backpay for about 30 minutes of unpaid, compensable work per month—or about $5.34 per week (A2421). This defeats plaintiffs' claims, regardless of their reasons for failing to request overtime, because the City cannot be deemed to have constructive knowledge of such sporadic and random unpaid time, averaging just two unpaid 15-minute periods a month—out of thousands of weekly overtime requests. Moreover, those two 15-minute periods per month encompass both pre- and post-shift claims, so the pre-shift portion is even more limited and sporadic.

And any argument that the City should have been aware of its employees' pre-shift time, despite their failure to report it as overtime, must take into account the CBA's negotiated eight-minute minimum for overtime requests. *See Holzapfel v. Town of Newburgh*, 145 F.3d 516, 525 (2d Cir. 1998) (employer's rules governing overtime—such as a "flex time"

50

rule—are relevant to assessing employer's constructive knowledge of unreported work). Here, it was wholly reasonable for the City to conclude that employees were not submitting overtime for pre-shift work because they were not working at least eight minutes—that is, they were not performing work eligible for overtime under the CBA.

Plaintiffs very often arrived at the station less than eight minutes before their shifts started (*see* A2969-70) and, on those days, it was no doubt reasonable for the City to believe that plaintiffs were not performing any compensable amount of work before the start of their paid time. Nor was it evident that plaintiffs were doing compensable pre-shift work—meaning, more than seven minutes of such work—on the days they happened to arrive more than seven minutes before the start of their shifts. A key reason employees arrived early was because they had to structure their commutes to avoid being late (*e.g.*, A1234-35, 1972). The stations all had kitchens, showers, and lounges with TVs where employees could engage in non-work tasks before their shifts. And, just like on the days where they arrived right before their shifts, on the days they happened to arrive earlier they still did not put in overtime

51

requests to report any compensable work. From the City's perspective, there was no discernible difference.

The City also knew that that no pre-shift work was actually necessary, as explained above. And even by plaintiffs' own account, the pre-shift work that they opted to perform on days they arrived early did not substantially exceed the CBA's minimum duration for compensable overtime. One plaintiff testified that her pre-shift work took just eight to 10 minutes—placing it just at the CBA's threshold for compensable overtime (A2595). Even if the City knew some plaintiffs sometimes opted to work for 8 to 10 minutes before their shifts, it would have been sheer surmise for the City to *presume*—simply because an employee arrived early—that such work was being performed but not reported.

In reaching the opposite conclusion, the district court cited three facts, none of which support affirmance.[5] The court found that plaintiffs offered legally sufficient evidence to show that they regularly engaged in unpaid pre-shift work (SPA114-15); that the City was "aware that at least some pre-shift and post-shift work was happening" based on the

---

[5] The fourth fact cited by the district court related only to narcotics exchanges and securements (SPA116). As noted above, the City does not contest on appeal the jury's liability finding on that issue.

City's drafting of a 2008 operations order about, among other things, work that employees should not do before their shifts (SPA115-16); and the City "encourag[ed] and incentiviz[ed]" pre-shift work by praising employees, in their evaluations, "for performing pre-shift work" (SPA116). But none of these findings were the sort permitted to be proven on a collective-wide basis under the court's pre-trial order certifying the plaintiffs as similarly situated on two issues (SPA43, 46).

And the scattershot proof on these three facts cited by the district court (SPA114-16) cannot sustain the jury's verdict, as a matter of law. For instance, the court's description of such work as "regularly" occurring is insufficient to show that such work was compensable, much less that the City had knowledge of it—particularly because instances of compensable pre-shift work were limited, sporadic, and largely dependent on happenstance. And the City's purported awareness that "some" work was happening (SPA115-16) is woefully insufficient where plaintiffs' theory is that every minute on the clock was unpaid work for which the City was liable. The same applies to the rare instances of acknowledgment of pre-shift work in evaluation reports—which did not even show individualized encouragement of *unpaid* pre-shift work.

53

The evidence was thus legally insufficient to support the jury's sweeping finding that the City should have known that 2,519 plaintiffs were performing compensable overtime, but failing to report it, every time they arrived more than seven minutes early.

### C. In any event, any underpayment was not willful.

At the very least, plaintiffs have not shown that that the City willfully failed to compensate them for their pre-shift work. Plaintiffs offered no evidence that the City "knew or showed reckless disregard for" whether it was appropriately compensating plaintiffs for pre-shift work. *Kuebel*, 643 F.3d at 366. The Court should therefore reverse the willfulness finding as to the pre-shift claims.

The core of plaintiffs' claim is that the City—while processing plaintiffs' thousands of weekly overtime requests, totaling nearly 390 million minutes during the relevant time, which yielded more than $10 million in approved overtime for plaintiffs annually—failed to notice roughly 30 minutes of unreported, unpaid work per plaintiff per month (*i.e.*, about two 15-minute overtime blocks per month). No reasonable juror could find that relatively small omission, based on the City's reliance on plaintiffs' self-reported time, to be reckless. Rather, the City

54

reasonably believed that when plaintiffs worked compensable non-shift hours, they would submit overtime requests—just as they did for 1.7 million approved overtime requests during the relevant time.

The City reasonably believed it could require employees to make use of a readily available timekeeping system to request overtime. The then-head of the New York City Law Department's Labor and Employment Division advised the City that FLSA "regulations and the law allowed for [the City] to require overtime slips to be submitted" for any unpaid work outside an employee's scheduled shift (A2934; *accord* A2920). This approach, she testified, comported with federal regulations permitting the use of timeclocks that track presence at the workplace rather than time worked (A2925). *See* 29 C.F.R. § 785.48.

Numerous circuits' decisions, addressed above in Section I.A, support the reasonableness of the legal advice that the City received and relied upon. This advice also acknowledged the realities of administering a public emergency response system in the nation's most populous city. As the FDNY's chief of training explained, he questioned employees when they had "significant amount[s]" of on-the-clock time without a

corresponding overtime request, but he would not second-guess their time-entry choices for unpaid time "of short duration" (A2318).

The district court focused on two pieces of evidence in incorrectly upholding the willfulness finding (SPA117-18). First, the court pointed to evidence that, in 2005, "thousands" of EMTs and paramedics put the City "on notice" that they wanted to be compensated for unpaid pre-shift and post-shift work (SPA117). But that notice occurred eight years before this lawsuit was filed, and four years before the City specifically implemented a robust electronic time reporting system, CityTime, that enabled EMTs and paramedics to accurately input their time worked and request overtime for work performed outside their shifts (A2076, 2091-92).

Employees' failure to utilize that system cannot support a willfulness verdict. The timekeeping system implemented after the 2005 "notice" enabled employees to report to the City precisely the sort of unpaid time their 2005 "notice" complained of. Notice that employees were working without pay in 2005 does not survive the institution of a new electronic reporting system that provided a clear mechanism for employees to report exactly that type of unpaid work they were complaining about in 2005. If anything, the subsequent *failure* of any

56

groups of EMTs or paramedics to provide similar notice *after* the introduction of CityTime merely serves to confirm the reasonableness of the City's belief that its employees were not in fact working compensable overtime when they failed to report such time.

Second, the court pointed to the City's draft 2008 operations order regarding pre- and post-shift work, and the City's failure to implement that order until 2014 (SPA118). The district court concluded that, at best, the 2008 and 2014 orders demonstrated awareness of "some" pre-shift and post-shift work (SPA115-16). Even if that were a permissible inference based on an operations order designed to limit pre-shift work and any associated overtime, such awareness cannot sustain a willfulness finding as to unpaid work every time a plaintiff arrived at least eight minutes before their paid time or departed at least eight minutes after their paid time.

## POINT II

### A NEW DAMAGES TRIAL IS NECESSARY BECAUSE THE COURT PREVENTED THE JURY FROM DECIDING THE KEY FACTUAL DISPUTE ABOUT DAMAGES

The district court's judgment adopted the damages calculation of plaintiffs' expert. That calculation hinged on a key assumption: that

57

every minute of plaintiffs' unpaid time during which they were "clocked in" constituted "time worked," up to a daily limit of 15 minutes before and after their paid time. The jury should have been asked, quite simply, to decide whether plaintiffs proved up that assumption. The court's refusal to ask the jury that question, and its decision to ask a different, misleading question that could not support the damages award, was legal error. That error requires a new trial on damages.

Plaintiffs' expert made clear that the fundamental assumption underlying his damages calculation was that *all* of plaintiffs' time at the station, after clocking in and before clocking out, constituted "time worked" under FLSA (A2437-38). Thus, in calculating damages, plaintiffs' expert assumed that plaintiffs "were working" during all that time (A2447). The expert acknowledged that plaintiffs' counsel directed him to predicate his analysis on that assumption, without identifying any basis for it. Plaintiffs therefore needed to prove, and the jury needed to find, that this critical assumption was factually sound.

But the district court never asked the jury to decide whether all of plaintiffs' time between clocking in and clocking out constituted "time worked" under FLSA. Despite the City's objections, the verdict sheet only

58

asked the jury whether plaintiffs had proven, by a preponderance of the evidence, that "the CityTime system accurately captures the unpaid pre-shift work minutes at issue in this case (i.e., up to 15 minutes of pre-shift work)" (A3280). The court then asked an identical question for post-shift time (*id.*).

It was unclear what these questions were asking. Any timeclock software, absent mechanical malfunction, "accurately captures" the times punched in and punched out. But that is not what mattered here; what mattered was time *worked*, as plaintiffs' expert admitted when he described the assumptions underlying his methodology (A2437-38, 2447). A finding that CityTime "accurately captured" the time at issue could simply mean that the time worked fell somewhere within the punch times the software recorded, not that the time was all "time worked." A wall calendar may "accurately capture" a year's federal holidays, but it *also* includes, and accurately captures, hundreds of other days.

This question befuddled the jurors, who asked the court to clarify its meaning during deliberations. The jury asked which of two interpretations was correct: were they to decide "whether the CityTime system documentation of preshift work time should all be considered

59

work time" or, rather, whether "the preshift work time in question is accurately captured in CityTime" (A3268). Over the City's objection, the court told them simply that the latter reading was correct (A3272).

By rejecting the jury's first proposed interpretation of the question, the court effectively instructed the jury that they were *not* to decide whether "the CityTime system documentation of preshift work time should all be considered work time" (A3268, 3272). But that question captured the key factual dispute surrounding plaintiffs' expert's key assumption; the court should have instructed the jury to answer that question or some variant of it. Instead, it instructed the jury to decide only whether "the preshift work time in question is accurately captured in CityTime"—a proposition that the City does not even dispute, insofar as "accurately captured" can mean "captured along with non-work time."

It was no surprise that the jury quickly answered yes to this question: the question was irrelevant, imprecise, and addressed an undisputed issue. Because this question deprived the City of its right to have a jury decide a core factual dispute underlying the damages award, a new damages trial is necessary. *See Blyden v. Mancusi*, 186 F.3d 252, 265 (2d Cir. 1999) (new trial required where it was "not at all clear

exactly what issues the district court intended to be established" by the verdict sheet questions and the court's instructions "reflect[ed] that confusion").

In denying the City's request for a new damages trial, the district court finally seemed to accept that the core assumption underlying the damages award was that "all minutes recorded by the [CityTime] system represent compensable work time" (SPA133-34). But instead of claiming that the jury actually had a chance to answer that question (which, indeed, it did not), the district court seemed to decide—for the first time— that the evidence could bear no other result. Hinting at harmless error, the court seemed to conclude there was "insufficient record evidence to indicate that a substantial amount of pre-shift time recorded in CityTime" was not time worked for the purposes of FLSA (SPA134).

That was simply wrong. There was ample record evidence that not all of plaintiffs' time at the station before or after their shifts constituted time worked. Every station had a kitchen, communal lounge, television, and showers (A1863-65, 2609-11, 2641). Plaintiff Bentkowski admitted that, after clocking in, she sometimes sat in the lounge and talked to coworkers, and that she also sometimes sat in the lounge after her shift,

"after [she] came off the ambulance and before [she] scanned out," to chat with coworkers (A1642-43). Others admitted to seeing co-workers sitting and eating in their stations' kitchens (*e.g.*, A1355-56). Others testified that the first thing they did upon clocking in was to put on their uniform, which was admittedly not compensable work (*see* A2041, 2782-83, 2806).

The record revealed numerous instances where plaintiffs remained at the station *after* their requested periods of overtime, without any evidence that they continued to work during that post-overtime period. It would be absurd to infer that they worked during that time but then intentionally excluded it from their overtime requests. Indeed, lead plaintiff Perry admitted that he was not working during time captured in CityTime after the end of overtime requests (A2051). But plaintiffs' damages calculation awarded damages even for the time following overtime requests (*see* A2451-56), based wholly on plaintiffs' unproven assumption—which the jury did not get to assess—that all such time was "time worked."

All of this evidence would have permitted a reasonable juror to conclude that some of plaintiffs' pre-shift and post-shift time was not "time worked" under FLSA. That question was central to plaintiffs'

damages calculation, and was for the jury to answer. It was reversible error for the district court to take that question out of the jury's hands.

## POINT III

### A NEW TRIAL ON EMTs' POST-SHIFT CLAIMS IS NEEDED BECAUSE THE COURT PREVENTED THE JURY FROM CONSIDERING THE CITY'S KEY DEFENSE

A new trial is needed on the question of post-shift FLSA liability for EMTs because the district court improperly removed from the jury's consideration the City's key defense to that claim—namely that the EMTs' brief post-shift exchange of equipment, which some plaintiffs said took only a minute or two, was de minimis. The court erred in granting summary judgment in plaintiffs' favor on that defense, and then ensured that this error infected the jury's verdict by directing the jury not to consider the defense. This was reversible error because it deprived the City of the ability to submit the defense to the jury.

Under FLSA, work may be "disregarded" as de minimis if it involves "only a few seconds or minutes … beyond the scheduled working hours." *Anderson*, 328 U.S. at 692. Whether work is de minimis is a question that involves consideration of (1) the administrative difficulty of recording the time; (2) the size of the claim in the aggregate; and (3) whether the tasks

occur regularly. *Gorman*, 488 F.3d at 594 n.7. No one factor is dispositive. *See id.*

Here, neither the summary judgment record nor the trial record justified depriving the City of this defense as a matter of law. On summary judgment, the court misperceived this task's duration and then presumed, without evidence, its regularity and that it could be accurately recorded. The court's summary judgment analysis—relegated to a three-sentence footnote—first recited plaintiffs' contention that they "spend up to six minutes per day on the exchange of equipment alone" (SPA10 (citing Pls. Reply 9)), even though that "six minutes" figure undisputedly was for paramedics' narcotics exchange, not EMTs' equipment exchange. The court then then concluded, without elaboration or citation to evidence, "I find that the time spent on exchanging equipment or narcotics is not de minimis since such time can [be] or is recorded in CityTime, the exchanges can take several minutes, and occur regularly" (SPA10).

But plaintiffs' evidence was a far cry from showing entitlement to summary judgment on this defense. Indeed, they failed to establish that any of the three factors weighed in their favor.

First, plaintiffs conceded there was ample evidence that EMTs' equipment exchange took only two to three minutes per shift (SDNY ECF No. 135-1, at 26). As to the "aggregate" time for each of the EMT plaintiffs, the summary judgment record contained no calculation or estimate at all. Courts have routinely found tasks of two or three minutes to be de minimis, or at least found a triable issue in such cases. *E.g.*, *Singh v. City of N.Y.*, 524 F.3d 361, 371 (2d Cir. 2008) (task that took "a few minutes" on some days was de minimis); *Reich v. N.Y.C. Transit Auth.*, 45 F.3d 646, 652 (2d Cir. 1995) (same). The district court's contrary conclusion, seemingly premised on the six-minute duration of a different task by different actors, was clearly wrong.

Second, plaintiffs did not eliminate triable issues as to the regularity of EMTs' post-shift equipment exchange. The City offered uncontroverted evidence that this exchange often happened *during* a plaintiff's shift, when it was paid work (*see* SDNY ECF No. 152, at 79). On reply, plaintiffs cited no contrary evidence (SDNY ECF No. 155, at 9). Plaintiffs' failure to eliminate triable issues as to the regularity of this post-shift work further counsels in favor of allowing the City to present its defense to the jury. *See Lindow v. United States*, 738 F.2d 1057, 1063-

64 (9th Cir. 1984) (eight minutes per day reading log book and exchanging information was de minimis where plaintiffs "did not always perform these duties before their shifts").

Third, plaintiffs failed to show that it would have been administratively easy to record this time. The district court incorrectly found that the time could be easily tracked because "such time can [be] or is recorded in CityTime" (SPA10). But CityTime's timeclock data merely recorded arrival and departure times. CityTime only tracked the duration of specific pre-shift or post-shift tasks when there were overtime requests submitted for those tasks.

And here, there was no reason to submit overtime requests for two- or three-minutes tasks, like the EMTs' equipment exchange, because that request would be rounded to zero minutes in accordance with the CBA. In *Lindow*, the Ninth Circuit held that tasks taking eight minutes were de minimis, as a matter of law, because they were not "always" performed outside the employees' paid shifts and because, under the employer's overtime rules, their duration was too short to qualify for overtime and thus would have been administratively difficult to track.

66

*Lindow*, 738 F.2d at 1063-64.[6] Here, as in *Lindow*, nothing compelled the conclusion that it would have been administratively easy or feasible for the City to record the time spent post-shift exchanging EMT equipment, which plaintiffs admitted took no more than three minutes. Plaintiffs thus failed to prove entitlement to summary judgment on the City's de minimis defense for EMTs' brief post-shift equipment exchange.

The district court then replicated this error by explicitly instructing the jury that the EMTs' post-shift equipment exchange was not de minimis (*see* A3255). When the City objected to that instruction, the court overruled the objection based on both its summary judgment ruling and because of the testimony it heard at trial (A3096-3101).

To the extent plaintiffs argue that the summary judgment ruling was harmless or superseded by the jury instruction based on trial evidence, that argument is meritless. The trial evidence in favor of the City's de minimis defense was even stronger than what appeared in the

---

[6] This Court expressly "adopted" *Lindow*'s test for the de minimis defense in *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 719 (2d Cir. 2001). Although this Court declined to follow a different part of the *Lindow* decision about voluntary work, *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 289 (2d Cir. 2008), the Court has continued to rely on *Lindow*'s framework for analyzing whether work is de minimis. *E.g.*, *Clarke v. City of N.Y.,* 347 F. App'x 632 (2d Cir. 2009).

summary judgment record. Multiple plaintiffs testified that the EMT equipment exchange took no more than two minutes (*see* A1643, 2789, 2904).[7] Indeed, the uncontroverted trial evidence that the EMTs' post-shift exchange took no more than few minutes is fatal to the EMTs' post-shift claim: such short periods of time are not compensable under the CBA, and cannot sustain an unpaid overtime claim here, as a matter of law, for all the reasons set forth in Point I, *supra*.

On this record, rejection of the City's defense as a matter of law constituted legal error. And depriving the City of this defense was undoubtedly prejudicial. The City is entitled to a new trial regarding FLSA liability for EMTs' post-shift time where the City may properly submit its de minimis defense to the jury.

---

[7] The trial evidence, just like the summary judgment record, also showed that the equipment exchange sometimes happened during the shift and also that it could not be easily recorded in CityTime (*see, e.g.*, A1363-64, 1423).

68

## CONCLUSION

The Court should vacate the judgment appealed from; enter judgment in defendants' favor on the claims for pre-shift overtime; and remand for a new trial on damages and on post-shift FLSA liability for EMTs.

Dated:  New York, NY
        December 10, 2021

Respectfully submitted,

GEORGIA M. PESTANA
*Corporation Counsel*
*of the City of New York*
Attorney for Appellants

By:  /s/ Daniel Matza-Brown
     DANIEL MATZA-BROWN
     Assistant Corporation Counsel

     100 Church Street
     New York, NY 10007
     212-356-5042
     dmatza@law.nyc.gov

RICHARD DEARING
DEVIN SLACK
DANIEL MATZA-BROWN
    *of Counsel*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared using Microsoft Word, and according to that software, it contains 13,333 words, not including the table of contents, table of authorities, this certificate, and the cover.

    /s/ Daniel Matza-Brown
DANIEL MATZA-BROWN