# 21-2095

## United States Court of Appeals
## for the Second Circuit

CHAZ PERRY, WAYNE ASKEW, BRANDAN BASS, JAMES
BEDDIA, and FRANTZ BONNEAU, *et al.*

*Plaintiffs-Appellees,*

*against*

CITY OF NEW YORK and
NEW YORK CITY FIRE DEPARTMENT,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Southern District of New York

**BRIEF FOR PLAINTIFFS-APPELLEES**

Gregory K. McGillivary
Molly A. Elkin
Sara L. Faulman
Diana J. Nobile
McGILLIVARY STEELE ELKIN LLP
1101 Vermont Ave. NW, Suite 1000
Washington, DC 20005
(202) 833-8855

*Attorneys for Plaintiffs-Appellees*

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................1

JURISDICTIONAL STATEMENT .....................................................3

ISSUES PRESENTED FOR REVIEW .................................................3

STATEMENT OF THE CASE...........................................................4

    A.  Litigation History ...............................................................4

    B.  The City Had a Policy or Practice of Suffering or Permitting
        EMT/Paramedics to Work Without Compensation ......................5

        1.  EMT/Paramedics Perform Critical Emergency Services Work .............5

        2.  EMT/Paramedics Regularly Perform Pre-Shift Work............................7

        3.  EMT/Paramedics Regularly Perform Post-Shift Work ........................11

        4.  The City Had a Policy or Practice of Suffering or Permitting
           Uncompensated Pre-Shift and Post-Shift Work ....................................13

        5.  CityTime Recorded EMT/Paramedics' Work Time, But Prevented
           Payment for Pre-Shift and Post-Shift Overtime Work .........................17

    C.  The City Acted Willfully in Violating the FLSA .......................20

    D.  The Jury Properly Relied on Representative Evidence in Finding the City
        Liable for FLSA Violations .......................................................22

STANDARD OF REVIEW AND SUMMARY OF ARGUMENT.......................22

ARGUMENT .......................................................................27

POINT I..........................................................................27

i

    A.  The City Flouts the Second Circuit's Standard for Proving FLSA
        Violations ...................................................................................28

    B.  The Jury Correctly Found That the City Had a Policy or Practice of
        Suffering or Permitting Uncompensated Overtime Work .........................35

POINT II ....................................................................................44

    A.  The Trial Court's Verdict Form Asked the Right Questions and Was
        Supported by Jury Instructions Consistent with the FLSA ......................45

    B.  Dr. Lanier's Testimony and Damages Calculations are Consistent with the
        Verdict Rendered by the Jury and Other Evidence Proving that CityTime
        Accurately Captures Work Time ................................................48

POINT III ...................................................................................52

    A.  The Court Lacks Jurisdiction to Hear an Appeal of the District Court's
        Summary Judgment Decision ...................................................52

    B.  The Court's Jury Instructions Were Proper .................................53

    C.  The City Waived Its Right to Object to the Format of the Verdict Form...58

CONCLUSION ..............................................................................59

CERTIFICATE OF COMPLIANCE .......................................................60

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ariz. Premium Fin. Co. v. Employers Ins. of Wausau*, 586 Fed. Appx. 713 (2d Cir. 2014) ................................................................................... 26, 54

*Arizona v. California*, 460 U.S. 605 (1983)..............................................54

*Blyden v. Mancusi*, 186 F.3d 252 (2d Cir. 1999)....................................46

*Caserta v. Home Lines Agency, Inc.,* 273 F.2d 943 (2d Cir. 1959)............ 24, 29, 47

*Cash v. County of Erie*, 654 F.3d 324 (2d Cir. 2011)..............................23

*Chao v. Gotham Registry, Inc*., 514 F.3d 280 (2d Cir. 2008)....................5

*Craig v. Bridges Bros. Trucking, LLC,* 823 F.3d 382 (6th Cir. 2016) ...................34

*Cross v. N.Y.C. Transit Auth*., 417 F.3d 241 (2d Cir. 2005) ..................23

*Devilla v. Schriver*, 245 F.3d 192 (2d Cir. 2001) ....................................26

*Doe v. East Lyme Bd. Of Educ*., 962 F.3d 649 (2d Cir. 2020) ...............54

*Fidelity & Guar. Ins. Underwriters, Inc. v. Jasam Realty Corp*., 540 F.3d 133 (2d Cir. 2008) ...............................................................25

*First Mercury Ins. Co. v. 613 NY Inc.*, 609 F. App'x 664 (2d Cir. 2015)...............25

*Forrester v. Roth's I.G.A. Foodliner, Inc,* 646 F.2d 413 (9th Cir. 1981)........ 32, 33

*Henry v. Wyeth Pharms., Inc*., 616 F.3d 134 (2d Cir. 2010) ...........................26, 55

*Herman v. RSR Sec. Servs.,* 172 F.3d 132 (2d Cir. 1999) .......................42

*Hertz v. Woodbury Cnty.,* 566 F.3d 775 (8th Cir. 2009) ................................. 31, 32

*Holzapfel v. Town of Newburgh,* 145 F.3d 516 (2d Cir. 1998) ............... 2, 5, 24, 29

*IBP, Inc., v. Alvarez*, 546 U.S. 21 (2005) ................................................................47

*Jarvis v. Ford Motor Co.*, 283 F.3d 33 (2d Cir. 2002) ............................... 27, 41, 58

*Keeling v. Hars*, 890 F.3d 43 (2d Cir. 2015) ..........................................................52

*Kinneary v. City of New York,* 601 F.3d 151 (2d Cir. 2010) ...................................44

*Kosakow v. New Rochelle Radiology Assocs. P.C.,* 274 F.3d 706 (2d Cir. 2001) ..55

*Kuebel v. Black & Decker Inc.,* 643 F.3d 352 (2d Cir. 2011) ......................... passim

*McLaughlin v. Richland Shoe Co.,* 486 U.S. 128 (1988) ........................................42

*Myers v. Hertz Corp.*, 624 F.3d 537 (2d Cir. 2010) ......................................... 54, 57

*Newton v. City of Henderson,* 47 F.3d 746 (5th Cir. 1995) ....................................32

*Omega SA v. 375 Canal, LLC*, 984 F.3d 244 (2d Cir. 2021)............................ 25, 53

*Ortiz v. Jordan*, 562 U.S. 180 (2011) .....................................................................52

*Pefanis v. Westway Diner, Inc.,* 2010 U.S. Dist. LEXIS 93180 (S.D.N.Y. Sept. 7, 2010) ....................................................................................................................4

*Perez v. City of New York,* 2017 U.S. Dist. LEXIS 159473 (S.D.N.Y. Sept. 27, 2017) ..................................................................................................................30

*Reeves v. Sanderson Plumbing*, 530 U.S. 133 (2000) .............................................23

*Reich v. New York City Transit Auth.,* 45 F.3d 646 (2d Cir. 1995) ........................55

*Singh v. City of New York,* 524 F.3d 361, 371 (2d Cir. 2008) ……………………56

*Shah v. Pan Am. World Servs., Inc.*, 148 F.3d 84 (2d Cir. 1998)............................25

*Tishmann v. ITT/Sheraton Corp.*, 145 F.3d 561 (2d Cir. 1998) .............................54

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) .........................................49

*United States v. Percoco*, 13 F.4th 158 (2d. Cir. 2021)...........................................26

*Vill. of Freeport v. Barrella*, 814 F.3d 594 (2d Cir. 2016)............................... 23, 38

*White v. Baptist Mem'l Health Care,* 699 F.3d 869 (6th Cir. 2012) ............... 31, 34

*Young v. Cooper Cameron Corp.,* 586 F.3d 201 (2d Cir. 2009) ...........................42

*Zellner v. Summerlin*, 494 F.3d 344 (2d Cir. 2007)..................................................23

**Statutes**

29 U.S.C. § 203 ....................................................................... 1, 28, 39

29 U.S.C. § 207 ...............................................................................1, 3

29 U.S.C. § 211 ...............................................................................29

29 U.S.C. § 255 ...............................................................................41

28 U.S.C. § 1291 ....................................................................... 3, 52

28 U.S.C. § 1292 ...............................................................................53

28 U.S.C. § 1331 .................................................................................3

**Regulations**

29 C.F.R. § 785.11 ...............................................................................28

29 C.F.R. § 785.12 .................................................................................5

29 C.F.R. § 785.47 ...............................................................................55

29 C.F.R. § 785.48 ...............................................................................43

29 C.F.R. § 790.6 ...............................................................................47

**District Court Docket Entries**

Dkt. 320.9 ……………………………………………………………………..58

**Other Authorities**

Fed. R. Civ. P. 49 ........................................................................................41

## PRELIMINARY STATEMENT

Following weeks of testimony and evidence, a jury resoundingly concluded that the City of New York and the FDNY (collectively, "City") willfully violated the Fair Labor Standards Act ("FLSA") by failing to pay overtime to 2,519 Emergency Medical Technicians (EMTs) and Paramedics (collectively, "EMT/Paramedics") for daily pre-shift and post-shift work, all of which was recorded on CityTime, the City's timekeeping system. The jury heard overwhelming testimony from EMT/Paramedics, FDNY chiefs, City officials, and supervisors regarding EMT/Paramedics' regular and routine performance of unpaid work. It heard unrebutted testimony from the EMT/Paramedics' expert witness that CityTime captured over ***thirty million minutes*** of unpaid pre-shift and post-shift time—time that numerous witnesses testified constituted work performed pursuant to City policy and/or practice. The jury reviewed FDNY policies and documents showing that, on a collective-wide basis, EMT/Paramedics were suffered or permitted to perform work before and after their shifts without pay, and, indeed, were commended for doing so.

The FLSA requires overtime compensation for work in excess of 40 hours in a workweek that has been "suffered or permitted" by the employer. 29 U.S.C. § 207(a); 29 U.S.C. § 203(g) ("employ" includes "to suffer or permit to work"). Despite the City's urging, the law does not require that work be both suffered ***and***

1

permitted to be compensable. Similarly, and again contrary to the City's claims, **_actual_** knowledge by the employer is not required to demonstrate that work was suffered or permitted. Instead, the employer's **_constructive_** knowledge proves FLSA liability. _Holzapfel v. Town of Newburgh,_ 145 F.3d 516, 524 (2d Cir. 1998). Moreover, because the jury found the City had a common policy or practice that violated the FLSA, the use of representative evidence to prove management knowledge was warranted. Finally, the jury heard voluminous evidence that the City's long-ignored FLSA violations were willful. The City's efforts to rewrite law and ignore evidence to avoid liability for its obvious FLSA violations must be rejected.

The City's arguments seeking a new trial on damages also fail because the Court's Verdict Questions are consistent with the FLSA's continuous workday rule, and evidence supported the jury's unanimous finding that CityTime accurately captures the worktime at issue. Finally, the City cannot demonstrate that the Court abused its discretion in concluding that the City was not entitled to the de minimis defense as to the EMTs' regular and recurring post-shift equipment exchanges.

The City's appeal rests on egregious misrepresentations of law and a disregard for facts and must be denied. Indeed, it is time for the 2,519 EMT/Paramedics to collect the overtime pay the City has unlawfully withheld for nearly a decade.

2

## JURISDICTIONAL STATEMENT

The District Court has federal question jurisdiction, under 28 U.S.C. § 1331, based on EMT/Paramedics' claims under the FLSA, including 29 U.S.C. § 207. The City's appeal on most of the issues raised are from a final judgment, providing this Court appellate jurisdiction under 28 U.S.C. § 1291. However, because the District Court's summary judgment decision on the City's de minimis defense is not a final judgment, and the City failed to move for an interlocutory appeal or file a Rule 50 post-trial motion on this issue, this Court does not have appellate jurisdiction over the City's argument as to the propriety of the summary judgment ruling.

## ISSUES PRESENTED FOR REVIEW

1. Did the jury have evidence from which to decide that EMT/Paramedics established, by a preponderance of the evidence, the City had a policy or practice of suffering or permitting work before their shifts without pay, and that this violation of the FLSA was willful?

2. Did the District Court abuse its discretion by submitting jury Verdict Questions that comport with the law, and by properly answering the jury's question consistent with the Supreme Court's continuous workday rule, where the jury's verdict is supported by sufficient evidence?

3. Did the District Court abuse its discretion by following the law of the case doctrine and instructing the jury on an issue squarely decided on summary

3

judgment—that was not timely appealed nor otherwise challenged by the City—that, as a matter of law, EMTs' post-shift exchange of equipment and information was regular and recurring, administratively feasible to record, and significant in the aggregate, and therefore not subject to a de minimis defense?

## STATEMENT OF THE CASE

### A. Litigation History

After years of litigation, extensive discovery, and a 13-day trial with testimony from 23 witnesses and introduction of 113 exhibits, a jury returned a verdict in EMT/Paramedics' favor on all issues, concluding that the City had a policy or practice of suffering or permitting EMT/Paramedics to perform uncompensated pre- and post-shift overtime work.

Following briefing on whether EMT/Paramedics are similarly situated under the FLSA, the Court held that liability could be established at trial if EMT/Paramedics demonstrate they "were common victims of a FLSA violation pursuant to a systematically-applied company policy such that there exists common questions of law and fact that justify representational litigation." Special Appendix ("SPA") 36 (quoting *Pefanis v. Westway Diner, Inc.,* 2010 U.S. Dist. LEXIS 93180, at *4 (S.D.N.Y. Sept. 7, 2010)). The District Court further held that questions that are "appropriately resolved through representational litigation" include whether the City has a policy or practice of suffering or permitting unpaid pre- and post-shift

4

work; and whether CityTime accurately captures the unpaid pre- and post-shift work, demonstrating that the City had knowledge of EMT/Paramedics' unpaid work. SPA46. *See Holzapfel,* 145 F.3d at 522; *Chao v. Gotham Registry, Inc*., 514 F.3d 280, 289-90 (2d Cir. 2008); 29 C.F.R. § 785.12. Contrary to the City's claims, the District Court did not fail to find EMT/Paramedics similarly situated with respect to supervisor knowledge (Brief for Appellants ("Br."), 10); instead, the District Court correctly held that where collective liability is established in one of the above-listed two ways, EMTs/Paramedics ***need not demonstrate*** that each individual employee's supervisor had knowledge of their overtime work. SPA38.

## B. The City Had a Policy or Practice of Suffering or Permitting EMT/Paramedics to Work Without Compensation

### 1. *EMT/Paramedics Perform Critical Emergency Services Work*

The City's EMT/Paramedics put their lives on the line to provide emergency medical care to citizens of New York. A1232, A2198. EMT/Paramedics respond to approximately ***1.6 million emergency calls*** per year, averaging 4,000 calls per day. A2200. These calls include a wide range of emergencies—injuries, cardiac arrests, drug overdoses, motor vehicle accidents, fires, shootings, or mass casualty incidents—and EMT/Paramedics are constantly exposed to hazards like bodily fluids, abrasions, cuts, respiratory problems, and eye injuries. A1294, A1677-68, A2203. EMT/Paramedics are certified by the New York State Department of Health to perform CPR, treat gunshot wounds, control bleeding, and immobilize fractures.

5

A2704-05. Because of this work, EMT/Paramedics are assigned and must maintain Personal Protective Equipment (PPE), including a helmet, gloves, coat, turn-out pants, boots, eye protection, face mask, and respirator, on every shift on their ambulance and must store this equipment at the station between shifts. A2202, A2704. *See* A1270 (rescue medics also carry a face piece for a self-contained breathing apparatus, harness, rope gloves). In addition, the City issues, and EMT/Paramedics must maintain, personal equipment including a duty belt, radio strap, shears, caliper, and a flashlight or pen light. A2215-16.

Time is of the essence in EMT/Paramedics' work; a single second can make a difference in saving lives. Consistent with the City's expectations, EMT/Paramedics arrive to work before the start of their shift, immediately clock in, and begin working so they are ready to respond to emergency calls. A1445-47. EMTs/Paramedics spend little to no time at their assigned stations during their shifts. Instead, EMT/Paramedics spend their shifts in ambulances, parked at a designated location called a Cross Street Location ("CSL"), waiting to be dispatched to an emergency call. A2648-49. *See also* A1292, A1601. While the City claims stations are equipped with kitchens and lounges where employees "were free to socialize or relax" pre-shift (Br., 12), the jury heard extensive evidence that this ***never*** occurred. A1605, A1682, A1957, A2024-25, A2591. Not only are these kitchens and lounges not a "place that you want to spend your time" because they are ill-equipped, dirty

6

and bedbug infested (*e.g.,* A1747), but EMT/Paramedics are expected to log on to the mobile dispatch terminal ("MDT") system inside their ambulances and head to their CSL within ten minutes after their shift begins to await call assignments at their cross-street locations. A1471, A1343, A2246, A2274. Once an ambulance is logged on as available, it can immediately begin receiving emergency calls. A1470.

### 2. *EMT/Paramedics Regularly Perform Pre-Shift Work*

Each day, EMT/Paramedics perform pre-shift work to meet the City's expectations that they be available to respond to emergency calls within minutes of their shift start. Contrary to the City's unsupported claims that "daily routines, interactions…and time-reporting practices varied greatly," Br., 7, the trial evidence overwhelmingly demonstrated that all EMT/Paramedics perform the same daily pre-shift work.

EMT/Paramedics clock into CityTime upon arrival at their stations and begin performing work. A1258, A1261, A1447, A1526, A1528, A1584, A1688, A1746, A1944, A2002-03, A2568, A2766-67, A2782-83, A2841, A2848, A2898-99. Pre-shift unpaid work includes:

- Meeting with Lieutenant for a pre-shift briefing or to obtain work assignments. A1264, A1268, A1529-30, A1584-85, A1668-69, A1683-84, A1747-48, A1944-45, A2003-04, A2568-69, A2767-68, A2806, A2841, A2849, A2899-901, A1448-49, A1805.

- Obtaining and inspecting PPE. A1269, A1274, A1533, A1586-87, A1675, A1684-85, A1749-50, A1757, A1947-48, A2006-07, A2568-69, A2736, A2768-69, A2783, A2806, A2841-42, A2849, A2899-900.

- Inspecting and donning equipment, including radio strap or holster, duty belt, stethoscope, Broslo tape, shears, and pen light. A1275-76, A1531-32, A1684, A1748-50, A1945-47, A2005-06, A2568-69, A2767, A2806, A2841, A2849, A2899-900.

- EMTs obtain their Technician's Bag and audit, inspect, and replace equipment in that Bag. A1586, 1588-90, A1749-49, A1756, A1954-55, A2768-69, A2806, A2841.

- If not relieving another tour, putting an ambulance into service. A1668-73, A1757, A1948-49, A2768, A2807.

- Performing additional duties as specifically instructed by a supervisor. A1426-27, A1945, A2004; *See also* A1529-30; A1585, A1592-93.

This pre-shift work occurred daily and was ***recorded on a minute-by-minute basis in CityTime***. *E.g*., A1300-01, A1551.

The City ignores trial testimony confirming that EMT/Paramedics must be "ready for duty" ***by the start of their paid tour***; EMT/Paramedics are not considered "ready for duty" if their PPE and personal equipment, including the equipment in EMTs' Technician's Bag, have not been inspected and confirmed to be in good working order. *E.g.,* A4823 (City policy requiring EMT/Paramedics to "Report punctually for duty as scheduled, in proper uniform, with all issued equipment and ready for duty, unless properly excused."); A1469 (City policy requires EMT/Paramedics to retrieve from their locker, inspect, and don duty belt, radio strap, shears, gloves, and additional equipment before the start of tour to be ready for duty); A1516 (management testimony — "Q. Do you consider an EMT to be ready for duty

8

if their tech bag is not checked? A. No."); A1835 (EMTs required to have a fully stocked and checked Technician's Bag, and EMT/Paramedics are required to have personal equipment ready and accounted for, to be considered ready for duty). A2232 ("If their PPE is not fully checked, are they ready for duty, no."); A4841.

The City disingenuously downplays the critical, detailed tasks of checking and inspecting PPE and personal equipment as merely "some level of check." Br., 17. In reality, EMT/Paramedics must take each piece of PPE out of a duffel bag and examine them, one by one, to determine whether it is in working order, free of rips, tears, and soiling. A2715, A1274-75, A1675, A1947-48. EMT/Paramedics must also confirm that their gas mask, and accompanying canister and seal, are functioning and their helmet shield is uncracked. A1675, A1684. *See* A2570 (when checking PPE, discovered goggles broken, gloves and ballistic vest missing).

EMTs follow the same process for Technicians' Bags. The City has a written policy identifying the numerous items that must be maintained in all Technician's Bags, and each item must be inspected (*e.g.*, burn sheet, multi-trauma dressing, five 8x10 dressings, twelve 4x4 dressings, insta-glucose, 500 ml sterile saline, etc.). A4837. EMT/Paramedics must perform this check pre-shift because once they log onto the MDT as "available" they can immediately be dispatched and may need their PPE or equipment on that call. *See* A1453 ("If [EMT/Paramedics] have not checked

9

it, it can work against them" and would hinder their ability to respond to an emergency situation.").[1]

Notably, the jury heard evidence that on the rare occasions that EMT/Paramedics did not arrive early to perform these activities pre-shift, they would have a "chaotic" day where they would not be "at [their] best." A1345; A2010 (on such occasions, "I am not able to fully check the gear like it should be checked completed by the time my tour starts. So I am much more under duress trying to make sure everything is there so I am prepared at the start of my tour."). Furthermore, EMT/Paramedics were not awarded ***any damages*** on the rare occasions when they failed to arrive early to perform the necessary work prior to the paid shift. A2409-10, A2413-14.

Thus, the City's claim that EMT/Paramedics only "sometimes chose to perform" pre-shift work, Br., 20, is plainly wrong and does not justify overturning the jury's verdict.

---

[1] The trial evidence fails to support the City's claim that EMT/Paramedics changed into uniforms after clocking in but before performing other compensable work. EMT/Paramedics testified that to the extent that they change into uniform at the station, they did so after performing other compensable tasks. *E.g.,* A1529 (performed narcotics audits as directed by Lieutenant before changing into uniform); A1748 (before going to locker room, speaks to Lieutenant to learn if ambulance will be late and if there are new orders); A2003-06 (speaks to Lieutenant about pertinent information from prior tour before going to locker room, dons ballistic vest before donning uniform). Indeed, most EMT/Paramedics testified that they arrive to work already in uniform. *E.g.,* A1586, A1667, A1701, A2550, A2767, A2893.

### 3. *EMT/Paramedics Regularly Perform Post-Shift Work*

The jury also heard significant evidence that EMT/Paramedics perform post-shift work daily, and that their post-shift work is nearly identical. After the end of the paid shift, EMT/Paramedics exchange equipment—keys, radios, CO meters, dosimeter, and a tablet—with the oncoming shift, documenting this exchange in a logbook in the Lieutenant's office. A2234-36, A1297, A1539-40, A1603-04, A1679-81, A1685, A1758-59, A1959-64, A2017-18, A2574-78, A2772-73, A2808, A2844-45, A2852-54, A2901.

In addition, EMT/Paramedics must exchange pertinent information with the oncoming tour after the end of their paid shift. A1808, A2238, A2330. The information and equipment exchange ***necessarily*** occurs ***after*** the paid shift because EMT/Paramedics can receive emergency calls up to the last second of their scheduled shift and must be ready to respond. A2235, A1459-60.[2]

Pursuant to City policy, Paramedics must exchange their narcotics after their paid tour in the presence of the Lieutenant, or, if there is no oncoming tour, secure the narcotics in a locker.[3] A4857 ("Obtain the controlled substance supply from the

---

[2] The only time EMT/Paramedics can return equipment before the end of a shift is if the ambulance goes out-of-service due to staffing or other issues. *See, e.g.,* A1651, A2571-72. In these circumstances, no damages were awarded for post-shift time because the work occurred during the paid tour. A2413-14, A2437.

[3] Beginning on April 22, 2016, the City conceded that the Paramedics' post-shift narcotics securement and audits are compensable and must occur after

paramedics going off duty, ensure that controlled substances are clear of particulate matter and have intact seals and manufacturer's labels and document such in the controlled substance transfer/security log."); A4861 (policy describing securement of narcotics with a Lieutenant if not transferred to subsequent tour); A4903; A1465-68. This exchange must also be logged in a City-maintained document. *Id.*

After the post-shift exchange, EMT/Paramedics perform additional work—securing and storing their PPE on gear racks, and their personal equipment, including EMT Technician's Bags, in their locker. A1297-98, A1541, A1604-05, A1681, A1685, A1759, A1964, A2018, A2586, A2773, A2808-10, A2845-46, A2854, A2903.

***Significantly, the City does not challenge the jury's finding that Paramedics were suffered or permitted to perform unpaid post-shift work.*** *See* Br., 2 (conceding jury's post-shift liability finding with respect to Paramedics should remain "intact"). While the City asserts it is entitled to a new trial regarding its liability for the EMTs' post-shift work on the ridiculous grounds that it should be allowed to argue that ***a portion*** of that work (the equipment exchange) is de minimis, the City does not

―――――――――――――

Paramedics' paid shift by issuing an Order providing a code for Paramedics to use to request 15 minutes of overtime for narcotics securement. A5148. However, even after 2016, requests for overtime for narcotics securement were not always approved. A2021. Further, Paramedics were not awarded damages on occasions they were paid for narcotics securement and had no additional uncompensated minutes recorded. A2413-14.

appeal the jury's finding that EMTs were suffered or permitted to perform post-shift work.

The only differences between the post-shift work performed by EMTs and Paramedics is that (1) Paramedics exchange narcotics in addition to the equipment and information exchanged by all EMT/Paramedics; and (2) EMTs store Technicians' Bags in addition to the other equipment and PPE stored by all EMT/Paramedics. The post-shift work occurred on a daily basis, before clocking out, and was **recorded on a minute-by-minute basis in CityTime**. *E.g.,* A1554 (performed work after shift ended until scanned out); A1604-05 (scans out after storing equipment and PPE); A1681; A1706-07 (scans out after exchange); A2273 (scans out after exchange and storing equipment and PPE); A2845-46 (same).

### 4. *The City Had a Policy or Practice of Suffering or Permitting Uncompensated Pre-Shift and Post-Shift Work*

The jury correctly found that the City had a policy or practice of suffering or permitting EMT/Paramedics to perform uncompensated work.

First, the City's policies caused EMT/Paramedics to perform the pre-shift and post-shift tasks described earlier. EMS OGP 101-1 (General Regulations) requires EMT/Paramedics to "[r]eport punctually for duty as scheduled, in proper uniform with all issued equipment and ready for duty, unless properly excused." A4823, A4832 (September 2018 Order: "at the beginning of their tour, members shall: Report punctually for duty as scheduled, in proper uniform, with all issued

13

equipment and ready for duty, unless properly excused."); A5150 (July 2019 Order: "Members are required to ensure the following are present before each tour: All required equipment is present and in good working order…Vehicle is clean, fully stocked, and part 800"); *see* A4840-42. Accordingly, to be "ready for duty," EMT/Paramedics necessarily collected and inspected their personal equipment and PPE, and EMTs collected and stocked their Technicians' Bags, before their paid shift. A1459, A1516, A2232, A1586, 1588-90, A1749-49, A1756, A1954-55, A2768-69, A2806, A284.

Similarly, per City policy, EMT/Paramedics must maintain all equipment until the end of their paid shift because they may be dispatched until the end of that shift. A1459-60. Notably, City policy mandates that the post-shift exchange of narcotics occur face-to-face with the oncoming shift and in the presence of a Lieutenant; failure to comply with this policy can result in "strict discipline." *See* A4857, A4861, A4903, A1467-68. Thus, to comply with City policies, EMT/Paramedics necessarily performed equipment and narcotics exchanges with the oncoming shift *after* their paid shift ended.

Additionally, the trial evidence revealed the City knew that EMT/Paramedics regularly performed unpaid pre-shift and post-shift work but took ***no action*** to prevent the work from being performed or to compensate EMT/Paramedics. While the City ***drafted*** a policy prohibiting pre-shift and post-shift work in 2008, the City

14

failed to *issue* the policy until 2014 ("2014 Command Order"), and even then, failed to enforce it. A2064, A2387-93, A2261. *See* A1550-1551, A1343.

The City's 2014 Command Order provides that "EMTs and Paramedics are not permitted to perform any work-related tasks before the start time of their shift or after the end time of their shift unless the work has been approved by a supervisor and such time has been accurately recorded on their timesheets" and that among the tasks EMT/Paramedics should not perform are: "restocking of technician's bags, ambulances, and/or narcotics pouches;…signing out radios, keys, or other equipment;…exchange of equipment, narcotics pouches, radios, and/or keys between off-going and oncoming crews;…receipt of briefings from supervisors regarding weather, traffic, or other related matters." A4914.

City witnesses admitted that *it is impossible to comply with* both the Department's operational rule *requiring* EMT/Paramedics to exchange equipment after shift *and* its late-issued, unenforced, litigation risk management 2014 Command Order *prohibiting* post-shift equipment exchanges. A2257-59. Similarly, *it is impossible to comply with* both the Department's operational rule *requiring* EMT/Paramedics to have all of their equipment in good working order prior to shift *and* its late-issued, unenforced, litigation risk management 2014 Command Order *prohibiting* pre-shift restocking. *Compare* A2232, A2340 *with* A4914-15. The history of the 2014 Command Order demonstrates that the City *knew* that

15

EMT/Paramedics were performing pre- and post-shift work as early as 2008, but turned a blind eye and continued to allow them to work without compensation *for years*. Even the City's 2014 Command Order acknowledges the proper standard for compensability: overtime work that is "permitted" must be paid. A4914.

The City also had a practice of favorably rating EMT/Paramedics in their annual performance evaluations for performing unpaid pre-shift work. A1446-47. The jury saw evidence that Lieutenants and Captains, including the EMS Chief of Operations, repeatedly evaluated EMT/Paramedics favorably based on their performance of unpaid pre-shift work. *E,g.,* A4943 ("EMT Bellido reports for work early and in proper uniform. She signs for all equipment and ensures her vehicle is stocked and Part 800."); A4957 (same); A4995 ("EMT Charles consistently reported to work 30 minutes early to make sure her unit is compliant with 10 NYCRR800. . . . She has the best log on times in the station shouldn't she get some credit for that?"); A5001 (same); A5025 ("Paramedic Concepcion is early to work and willing to help out with the needs of his station prior to his tour of duty including maintaining the ALS room."); A5046 (Paramedic Graham's "ambulance is always stocked and ready for assignments prior to the start of her tour"); A5055 (same). These examples are not a "tiny number of cherry-picked performance evaluations," Br., 49, but instead reflect the City's widespread practice of encouraging and commending employees for performing unpaid pre-shift work.

16

The abundant evidence of EMT/Paramedics' daily pre-shift and post-shift work provided a sufficient basis for the jury to find the City maintains a policy or practice of suffering or permitting uncompensated overtime work. Indeed, the City does not challenge the jury's finding with respect to post-shift work.

### 5. *CityTime Recorded EMT/Paramedics' Work Time, But Prevented Payment for Pre-Shift and Post-Shift Overtime Work*

The jury determined that CityTime records and accurately captures the unpaid overtime work at issue in this case. This, coupled with other evidence, was sufficient to establish both the City's knowledge of the unpaid work and the damages owed to all EMT/Paramedics.

City witnesses repeatedly admitted that CityTime was designed to capture *work time*. A1888, A2124. To record work time, EMT/Paramedics are expected to use a hand-scanner to mark the start and end of their workday. A1895. These scanners are in each station, typically across from the Lieutenant's office. *See* A1261, A2614, A2630-31. CityTime captures the exact minute an EMT/Paramedic scans in and out. A1894, A1896. EMT/Paramedics' supervisors review their clock-in and clock-out times ("punch times") daily. 1473, A2288, A2291.

Despite this precise record and daily review, the City fails to pay EMT/Paramedics for every minute they are clocked into CityTime. A1896-97. Indeed, the only time the City relies on punch times for pay is when it ***docks*** the EMT/Paramedics' pay on a minute-by-minute basis for tardiness. A1896-97.

Although CityTime could be programmed to pay employees based on punch times, the City instead utilizes a "pay to schedule" system where time recorded outside an employee's regularly scheduled shift is categorized by the system as "uncompensated." A2937-38, A1897-98. During the recovery period, CityTime recorded more than ***30,449,855 minutes*** of uncompensated EMT/Paramedic pre- and post-shift time. A2421. Remarkably, the City admitted it never audited any of these recorded-but-unpaid minutes. A2076, A2947. Similarly, although CityTime is programmed to round to the nearest 15-minute increment, the City never monitored the punch times to determine whether "major discrepancies" existed or if employees are fully compensated for all the time they actually worked. A2947-50.

The City fails to automatically pay EMT/Paramedics overtime for recorded minutes captured in CityTime. Instead, for pay to be generated for overtime work, the City requires EMT/Paramedics to submit a separate overtime request that includes both a reason and a four-digit code, which are inputted through pre-populated drop-down menus. A1898, A3137, A1389-90. There are only seven limited reasons to choose from in the drop-down menu: there is no option for pre-shift work. A1319-40, A1910; (Anson did not request overtime for pre-shift work because no option in CityTime); A1319-20; *see* A1969 (listing limited types of work

18

for which overtime requests could be submitted).

EMT/Paramedics were not permitted to input overtime requests for pre-shift work. *E.g.,* A1844 (City supervisor does not allow EMTs/Paramedics to request overtime for inspecting equipment before the shift because such overtime is not "requestable"); A1810; A1949. Indeed, EMT/Paramedics were instructed, and it was common knowledge in the FDNY, that overtime requests for these activities would be denied. A1545, 1556.

As another effort by the City to minimize payment of overtime, the jury heard evidence that EMT/Paramedics were required to check-off a legalistic "certification" when submitting their weekly time. A4434. The City ignores that this certification was mandatory regardless of whether it was accurate. EMT/Paramedics would not receive ***any pay*** if they failed to check the box agreeing to the certification. *See* A1304, A1474-75, A1632, A1762, A1851-52. EMT/Paramedics were not given any training on the certification other than the requirement that they check the box to be paid. *E.g.,* A1697, A1762, A1852, A2027. Importantly, the jury heard evidence that the certification language was ***not*** intended as a reminder to employees to make overtime requests for the pre-/post-shift work at issue in this case, but instead to insulate the City from liability—i.e., to "hold up in court." A2150.

The jury correctly found that CityTime accurately captures EMT/Paramedics' work time, including their pre-shift and post-shift unpaid overtime work.

19

## C. The City Acted Willfully in Violating the FLSA

The jury heard ample evidence that the City showed reckless disregard for whether its conduct violated the FLSA. In 2005, the City was "placed on notice" that thousands of EMTs/Paramedics—some of whom testified as supervisors and EMS chiefs in this case—requested to be paid for the same pre- and post-shift unpaid work activities at issue here, but the City took *no steps* to change its policies and practices. A1345, A1491, A1552-53, A1827, A2076, A2110, A2266, A2345. Indeed, despite being placed on notice over 15 years ago, the City *did nothing* to explore its obligations under the FLSA with respect to its pay policies and practices.

Additionally, the jury heard the following evidence:

- The City failed to conduct an audit of the over 30,000,000 unpaid pre- and post-shift minutes captured in CityTime as "uncompensated" hours. A2076, A2947.

- The City failed to conduct a study regarding what EMS personnel do in the stations prior to the start of their paid shifts or after their paid shifts while clocked into CityTime. A2951.

- The City failed to seek advice from the Department of Labor about whether its pay practices comply with the FLSA. A2951.

- The City failed to consider the nature of the pre- and post-shift work performed by EMS personnel when implementing and programming CityTime. A2940-42.

- The City failed to follow the City Law Department's advice that the employer is required to pay overtime for work about which it knows, even if the employee fails to put in an overtime request. A2114-15.

20

- The City Law Department never told the FDNY Director of Payroll, Timekeeping and Compliance that it is the supervisors' responsibility to ensure that overtime is paid for work performed by EMT/Paramedics even when they do not request overtime pay. A1903.

- The City failed to explore the "major discrepancies" between the punch times recorded in CityTime and the paid work time in violation of 29 CFR § 785.48, a regulation about which the City was aware. A2946-48.

- The City prepared Command Orders prohibiting pre-shift and post-shift work in 2008, but failed to issue those Orders until October 2014. A2387-88, A2390, A4914-15, A5139-44, A5146. Even then, the City failed to enforce these Orders, and they were not followed. A1550-51, A1693-94, A1760-61, A1950, A2008, A2017-18, A2351-52.

- The City waited **11 years** after EMT/Paramedics first put the City on notice that they wanted to be paid for pre- and post-shift work, and **three years** after this lawsuit was filed, to create a code for Paramedics to use for 15 minutes of overtime for narcotics audits and securement. A5148. Even then, the Order **does not apply** to post-shift narcotics transfers, or to post-shift equipment exchanges. *Id.*

- Lieutenants and Captains, including the current EMS Chief of Operations, repeatedly commended EMT/Paramedics for performing unpaid pre-shift work. A4916-5137.

- The City never implemented paid overlapping shifts even though it knew that EMT/Paramedics worked *de facto* overlapping shifts. A2198-99, A2270.

The City callously refer to the **tens of millions of minutes** of unpaid overtime as a "relatively small omission." Br., 54. The jury recognized that the City's obligation to pay for this work time is significant. As such, the jury's finding that the City willfully violated the law was supported by the evidence in the record.

21

**D. The Jury Properly Relied on Representative Evidence in Finding the City Liable for FLSA Violations**

The City misstates the District Court's ruling with respect to whether EMT/Paramedics are similarly situated. *See* Br., 10. Most significantly, the City ignores that EMT/Paramedics were not required to demonstrate that each individual EMT/Paramedic's supervisor had knowledge of that EMT/Paramedic's work. SPA38. Instead, individualized supervisor knowledge would only become relevant *if* EMT/Paramedics could not prove that the City maintained a policy or practice of suffering or permitting unpaid overtime work or that CityTime recorded EMT/Paramedics' unpaid pre-shift and post-shift work time. SPA46. As described above, the evidence demonstrated—and the jury correctly found—the City maintained a policy or practice of suffering or permitting work ***and*** CityTime accurately captures EMT/Paramedics' work time. A3783-86. Thus, the City was held liable on a collective basis, and there was no need to delve into individual supervisor's knowledge.

## STANDARD OF REVIEW AND SUMMARY OF ARGUMENT

*First*, the District Court did not err in denying the City's motion for judgment as a matter of law with respect to the jury's verdict, reached after hearing 11 days of testimony, that EMT/Paramedics established by a preponderance of the evidence that the City has a policy or practice of suffering or permitting them to perform overtime work before their shifts without pay.

22

This Court reviews de novo the district court's decision on a motion for judgment as a matter of law; the court must "apply the same standard that is required of the district court." *Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007). "That standard generally imposes a heavy burden on [the] movant." *Cash v. County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011). The burden is "particularly heavy where . . . the jury has deliberated in the case and actually returned its verdict in favor of the non-movant." *Id.* (quoting *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005) (internal quotations omitted)).

The district court:

> ***must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence*** . . . . Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . .Thus, although the court should review the record as a whole, ***it must disregard all evidence favorable to the moving party that the jury is not required to believe.***

*Reeves v. Sanderson Plumbing*, 530 U.S. 133, 150-51 (2000) (emphasis added). Thus, where a jury has returned a verdict in favor of the non-movant, Rule 50 motions may be granted "only if the court, viewing the evidence in the light most favorable to the nonmovant, concludes that a reasonable juror would have been *compelled* to accept the view of the moving party." *Vill. of Freeport v. Barrella*, 814 F.3d 594, 608 (2d Cir. 2016) (quoting *Cash*, 654 F.3d at 333) (emphasis in original).

23

Here, the jury was presented with overwhelming evidence that the City suffered or permitted EMT/Paramedics to perform compensable work before and after their shifts without the pay required by law, that the City had actual or constructive knowledge of that work, and that the City's violations are willful.

The City's attempt to proffer a non-existent standard directly contrary to Second Circuit precedent should be given no weight; settled law demands that "once an employer knows or has reason to know that an employee is working overtime, it cannot deny compensation ***even where the employee fails to claim overtime hours.***" *Holzapfel*, 145 F.3d at 524 (citing *Caserta v. Home Lines Agency, Inc.,* 273 F.2d 943, 946 (2d Cir. 1959)) (emphasis supplied). *See Kuebel v. Black & Decker Inc.,* 643 F.3d 352, 363 (2d Cir. 2011). Moreover, the City's fabricated claim that in a collective action "constructive knowledge is an insufficient basis to impose" FLSA liability (Br., 49) must be rejected as it conflicts directly with settled law, which holds "[a]n employer need not have actual knowledge of such…work; ***constructive knowledge will suffice." Holzapfel,*** 145 F.3d at 524 (emphasis supplied). Finally, the jury heard from numerous City officials whose testimony plainly demonstrates that the City's violations were willful.

*Second*, the City cannot demonstrate a new damages trial is necessary based on Verdict Questions 3 and 4, or on the Court's response to the jury's question during deliberations on those questions. "The formulation of special verdict questions rests

24

in the sound discretion of the trial judge and should be reviewed by an appellate court only for an abuse of that discretion." *First Mercury Ins. Co. v. 613 NY Inc.*, 609 F. App'x 664, 668 (2d Cir. 2015). The formulation of special verdict questions will warrant reversal only if the questions mislead or confuse the jury, or inaccurately frame the issues to be resolved. *See Fidelity & Guar. Ins. Underwriters, Inc. v. Jasam Realty Corp.*, 540 F.3d 133, 139 (2d Cir. 2008). The Court must read challenged questions "in conjunction with the judge's charge to the jury." *Shah v. Pan Am. World Servs., Inc.*, 148 F.3d 84, 96 (2d Cir. 1998) (internal quotations omitted). Here, the verdict form, jury instructions, and the Court's answer to the jury's questions complied with the law, and the jury's verdict stemmed from abundant record evidence.

*Third*, no grounds exist to grant the City a new trial with respect to EMTs' claim for post-shift overtime work. In its 2018 summary judgment decision, the District Court rejected as a matter of law the City's asserted defense that EMT/Paramedics' post-shift equipment exchange was de minimis. SPA10. Tellingly, the City never filed a petition for interlocutory appeal and did not file a Rule 50 motion for judgment as a matter of law on the de minimis defense. Thus, the Court lacks jurisdiction to review the District Court's ruling now on appeal. *Omega SA v. 375 Canal, LLC*, 984 F.3d 244, 251 (2d Cir. 2021).

The City fails to acknowledge the law of the case doctrine, an omission it also made in its Rule 59 motion requesting a new trial. SPA131. However, in asking this Court to order a new trial because the District Court instructed the jury consistent with its summary judgment ruling, the City is actually arguing that the application of the law of the case doctrine was in error. That decision is reviewed for an ***abuse of discretion***, not de novo. *Ariz. Premium Fin. Co. v. Employers Ins. of Wausau*, 586 Fed. Appx. 713, 716 (2d Cir. 2014) (citing *Devilla v. Schriver*, 245 F.3d 192, 198 (2d Cir. 2001)).

De novo review would be the standard only if the City's argument for a new trial was based on a challenge to the general jury instructions on de minimis. *United States v. Percoco*, 13 F.4th 158, 174 (2d. Cir. 2021). However, if the jury was adequately informed of controlling law, as occurred here, this Court must not disturb the verdict. *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 146 (2d Cir. 2010). Indeed, this Court will only reverse and order a new trial where the appellant can show that, viewing the charge as a whole, there was prejudicial error; even if an instruction is found to contain errors, reversal is not warranted if the error was harmless. *Percoco,* 13 F.4th at 174-75.

The District Court properly instructed the jury as to the City's de minimis defense, consistent with its previous decision and the de minimis standard. Trial evidence buttresses the District Court's summary judgment decision and

26

demonstrates that it did not err in applying the law of the case doctrine, and even if it had erred in the specific instruction on the de minimis defense, *which it did not*, any such error is harmless given the Court's instructions on the continuous workday rule, and the evidence presented to the jury. In other words, because the portion of the workday that the City wants a new trial on—EMTs' equipment exchange—occurs *before* the last principal activity of the workday (i.e., storing PPE, personal equipment, and Technicians' Bags), the exchange is compensable as part of the continuous workday even if the amount of time performing that particular task is de minimis.

Finally, at no point previously did the City raise the argument that it obliquely raises here—that EMTs should have been treated differently from Paramedics with respect to post-shift work or any other issue in the case. Because the City failed to object to EMTs and Paramedics being tied together in Verdict Question 2, the City has waived any grounds to appeal the formulation of that question. *See, e.g.*, Fed. R. Civ. P. 49(a); *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 56 (2d Cir. 2002).

## ARGUMENT

### POINT I

**THE JURY HEARD OVERWHELMING EVIDENCE THAT THE CITY HAS A POLICY OR PRACTICE OF SUFFERING OR PERMITTING UNPAID PRE-SHIFT WORK, AND THAT THE CITY'S FAILURE TO PAY FOR SUCH WORK WAS WILLFUL**

27

## A. The City Flouts the Second Circuit's Standard for Proving FLSA Violations

The City's arguments hinge on its misrepresentation that a "bright-line rule" has been adopted by other Circuit courts that allegedly provides "an employer can be held liable for employees' unreported work only if a plaintiff establishes that the employer either (a) required the work to be performed outside employees' regular hours, or (b) had actual knowledge that unpaid work was being performed outside employees' regular hours." Br., 37. No such rule exists.

First, the City's argument that there is no liability unless "the City required them to do the pre-shift work at issue" wrongly asks this Court to rewrite the FLSA to necessitate payment only for work that is "required." Br., 39. To prevail, EMT/Paramedics do not have to prove that work was required (i.e., suffered); instead, they can prove their case by demonstrating that the City allowed the work (i.e., **permitted** it). 29 U.S.C. § 203(g) (employ "includes to suffer or permit to work"); 29 C.F.R. § 785.11 ("Work not requested but suffered or permitted is work time.").

Next, the City urges the Court to disregard the Second Circuit's clearly established bright-line rule for proving FLSA liability for "suffer **or** permitted" work where the employer has **constructive** knowledge. The City falsely contends that "constructive knowledge is an insufficient basis to impose liability." Br., 49. Under long-standing precedent, "once an employer knows or **has reason to know** that an

employee is working overtime, it cannot deny compensation ***even where the employee fails to claim overtime hours.***" *Holzapfel,* 145 F.3d at 524 (citing *Caserta,* 273 F.2d at 946) (emphasis supplied). *See also Kuebel,* 643 F.3d at 363. Put simply, employees cannot work for free when the employer knows or ***has reason to know*** they were working.

The City attempts to justify its brand-new standard by claiming that because it has a "readily available timekeeping system" that permits EMT/Paramedics to request overtime, the longstanding caselaw no longer applies. Br., 37. There is no legal support for this contention.

The burden to accurately record an employee's work hours—including overtime hours—falls on the employer, and it cannot be delegated to employees. *Kuebel,* 643 F.3d at 363 ("[A]n employer's duty under the FLSA to maintain accurate records of its employees' hours is non-delegable"). *See* 29 U.S.C. § 211(c); *Caserta,* 273 F.2d at 946 ("The obligation is the employer's and it is absolute. He cannot discharge it by attempting to transfer his statutory burdens of accurate recordkeeping…and of appropriate payment, to the employee."). To require otherwise would "undermine the remedial goals of the FLSA, as it would permit an employer to obligate its employees to record their own time, have its managers unofficially pressure them not to record overtime, and then, when an employee sues

29

for unpaid overtime, assert that his claim fails because his timesheets do not show any overtime." *Kuebel,* 643 F.3d at 364.

In deciding *Kuebel,* the Second Circuit anticipated the exact argument the City makes here and categorically rejected it. As such, the City's reliance on its "readily available timekeeping system" CityTime (Br., 37-38)—a system that records the pre- and post-shift work time at issue but was designed to ***disregard*** that time for the purpose of cheating employees out of pay by requiring them to submit overtime requests for "unrequestable" work—is wholly misplaced. Indeed, to the extent an employer attempts to hide behind a timekeeping system to be relieved "of its duty to maintain accurate records of employee hours or to absolve the employer of liability for overtime hours of which it was aware, it is inconsistent with…Second Circuit caselaw[.]" *Perez v. City of New York,* 2017 U.S. Dist. LEXIS 159473, at *63 (S.D.N.Y. Sept. 27, 2017) (on remand, rejecting City's argument raised here).

The City's position is not only directly contrary to established law, but also to its own pre-trial position. First, the Court instructed the jury that, to prevail, EMT/Paramedics needed to "establish, by a preponderance of the evidence, that defendants have a policy or practice of ***suffering or permitting*** EMT/Paramedics to perform work either before and/or after their shifts without pay." A3249 (emphasis added). The City did not object. A3082-83. Further, the Court instructed the jury on the definition of "policy or practice," instructing that a "practice" need not be

30

"followed by every supervisor at every station at all times." A3523-54. The City did not object. A3086-87. Next, the Court instructed the jury that "Plaintiffs bear the burden of proving . . . that defendants had actual *or constructive* knowledge that plaintiffs were performing preshift and/or post shift work." A3252. Again, the City did not object. A3083-3087.

There is simply no justification for a departure from the Second Circuit's well-established bright-line rule, and the City cannot be permitted to create a new standard, one inconsistent with the precedent in the Second Circuit, other Circuit Courts, and the FLSA itself. Notably, the City misleadingly ignores that every case it claims supports its proposed new standard, Br., 38-39, *is consistent with the existing standards in the Second Circuit.* Moreover, these cases actually hold that an employer is liable for FLSA violations where it has actual *or* constructive knowledge of its employees' uncompensated overtime work. *See, e.g., White v. Baptist Mem'l Health Care,* 699 F.3d 869, 873 (6th Cir. 2012) ("If an employer knows or has reason to believe that a worker is continuing to work then the time is working time."); *Hertz v. Woodbury Cnty.,* 566 F.3d 775, 781 (8th Cir. 2009) ("Because constructive knowledge of overtime work is sufficient to establish liability under the FLSA, if the County, through reasonable diligence, should have acquired knowledge that Plaintiffs were working in excess of their scheduled hours, the jury would have been empowered to find the County liable."); *Newton v. City of*

31

*Henderson,* 47 F.3d 746, 748 (5th Cir. 1995) (plaintiff must show that he was "employed" during his overtime hours, meaning "the City had knowledge, actual or constructive, that he was working."); *Forrester v. Roth's I.G.A. Foodliner, Inc.,* 646 F.2d 413, 414 (9th Cir. 1981) ("Thus an employer who knows or should have known that an employee is or was working overtime must comply with the provisions of § 207. An employer who is armed with this knowledge cannot stand idly by and allow an employee to perform overtime work without proper compensation, even if the employee does not make a claim for the overtime compensation.").

The City relies on *Hertz* for the alleged proposition that an employer is not liable for overtime violations where it has an established procedure for overtime claims used regularly by employees. *See* Br., 38, 42. However, the Eighth Circuit distinguished its holding in *Hertz* from situations—like here—where "courts have found constructive knowledge based on an employer's access to non-payroll records," noting that there was no "indication here that the officers were discouraged from submitting overtime slips" and there was no evidence that the employer "was on notice that hours were being regularly under-reported or that it should have been monitoring hours more closely." *Hertz,* 566 F.3d at 783.

In *Forrester*—unlike in this case—there was no evidence the employer "deliberately turned its back on a situation" or negligently maintained records required by the law, nor evidence that the employer should have known the plaintiff

worked additional hours. *Forrester,* 646 F.2d at 414. Similarly, in *Newton,* evidence of constructive knowledge was limited to supervisors' "access" to general information about job duties performed by members of the task force on which the plaintiff worked and did not support a finding the employer encouraged the plaintiff to falsely report his hours.

Here, the City had both actual and constructive knowledge that EMT/Paramedics performed pre- and post-shift work which was derived from more than just a general awareness of their job duties. Indeed, the jury heard evidence that EMT/Paramedics' supervisors not only have access to timesheets indicating daily punch times, but they review them daily. A1473, A2288, A2291, A1888. Supervisors also observed pre-shift and post-shift work. *See, e.g*., A2326.

In addition, unlike in *Forrester* and *Newton,* the jury heard evidence that the City ***permitted the work,*** turned a blind eye to such work, and, indeed, discouraged employees from accurately reporting such work. The jury heard evidence the City drafted the 2014 Command Order (in 2008) prohibiting pre- and post-shift work, but failed to issue it for years and, even then, did not enforce it, all the while ***allowing*** EMT/Paramedics to perform the very same pre-shift and post-shift work allegedly prohibited by this late-issued/never-enforced Order without pay. *See* A2064, A2257-59, A2261, A2387-93. The jury also heard evidence from Deputy Chief Ortiz that the City ***does not allow*** EMT/Paramedics to "request overtime for things like

33

checking equipment prior to the start of the shift" as this type of overtime "is not requestable." A1844.

Finally, the City ignores that the Sixth Circuit explicitly distinguished the *White* facts from cases that "involved situations where the employer prevented employees from reporting overtime *or were otherwise notified of the employees' unreported work.*" *White,* 699 F.3d at 876 (emphasis supplied). In *White,* there was no evidence the employer discouraged employees from reporting unpaid time worked or was "otherwise notified that their employees were failing to report time worked during meal breaks." *Id.* at 877. That is not true here, where the jury heard extensive evidence not only of the City's efforts to discourage overtime reporting for the pre- and post-shift activities at issue, but also of the myriad ways, discussed *infra*, in which the City was notified of EMT/Paramedics' unpaid work time. Moreover, the City ignores that subsequent to *White,* the Sixth Circuit instructed courts to apply a narrow reading of the decision, holding that even where employees fail to comply with an established overtime reporting system, employers who prevent employees from reporting overtime work *or have notice of unreported work* are "still on the hook for unpaid overtime." *Craig v. Bridges Bros. Trucking, LLC,* 823 F.3d 382, 389 (6th Cir. 2016).

The City's invitation to adopt its invented "actual knowledge" liability standard based on the mere existence of an electronic timekeeping system should be rejected.

## B. The Jury Correctly Found That the City Had a Policy or Practice of Suffering or Permitting Uncompensated Overtime Work

The jury heard evidence that the unpaid work was not only permitted, but also required, and that the City had both actual and constructive knowledge of such work.

As the City's witnesses repeatedly and uniformly testified at trial, the City's policies explicitly require EMT/Paramedics to inspect and prepare their equipment and PPE to be ready for duty by the start of their tour. A1459, A1516, A2232, A4823. Similarly, the City's policies explicitly require EMT/Paramedics coming off shift to exchange equipment after the end of the tour's paid shift. Even the head of the EMS Department testified that this exchange requires one tour (the outgoing tour) to complete work outside of their shift—i.e., without pay. A2234-2236.

The jury also heard evidence of numerous ways the City permitted EMTs/Paramedics to perform unpaid work when it had actual knowledge such work was being performed, but did nothing to stop it. EMT/Paramedics testified that their supervisors observed them performing pre-shift and/or post-shift work but were never instructed to stop performing such work or asked how much time they spent performing it. Supervisors confirmed this. A1550-51, A1693-94, A1760-61, A1950, A2008, A2017-18, A2351-52. EMT/Paramedics testified that they regularly speak

35

to their supervisors to obtain a pre-shift briefing before the start of their tour. A1264, A1268, A1529-30, A1584-86, A1668-69, A1683-84, A1747-48, A1944-45, A2003-04, A2568-69, A2767-68, A2806, A2841, A2849, A2899-901. Supervisors confirmed this. A1448-49, A1804-05. EMT/Paramedics' performance evaluations reveal that supervisors observed and commended them for performing pre-shift work without pay. A4995, A5025, A5046. Indeed, one supervisor specifically noted that an EMT arrives early and when supplies are dropped off, "will take it upon herself and *without asking for any compensation* will put away and organize the bls supplies and supply room." A5055 (emphasis supplied).

Constructive knowledge was also proven when the City admitted that it tracks EMT/Paramedics' work time through CityTime, and that supervisors have access to EMT/Paramedics' schedules and daily punch times and regularly review these times. A1888, A1473; A2124, A2288, A2291. The City's claims regarding the alleged "agreed-upon rounding rules" for overtime requests (Br., 13, 50-51) have no bearing on whether the City had constructive knowledge of such work because CityTime captures the EMT/Paramedics' exact punch times. A1894. Notably, the City docks pay for lateness on a minute-by-minute basis through CityTime. A1896. Moreover, multiple City witnesses testified that CityTime captures employees' *work time* (A1888, A2124), which makes the City's attempts to disclaim knowledge based on the rounding method all the more disingenuous.

36

The City incorrectly claims that the EMT/Paramedics cannot prove constructive knowledge because Dr. Lanier calculated a "weekly damages figure of $5.34 per plaintiff," or "just 0.13 hours or 8 minutes of unpaid overtime" per EMT/Paramedic per week. Br., 50. This is misleading. As Dr. Lanier testified, he calculated this figure by looking at the total damages from the last six months of data produced by the City, divided by the EMT/Paramedics employed as of the end of the data. A2420-21. It is an averaging of data that may include EMT/Paramedics who were not working during the time period that was used to approximate damages because the City did not produce actual payroll data. Moreover, the unrebutted evidence shows the total amount of uncompensated work was significant. In fact, Dr. Lanier's analysis, which capped the damages at 15 minutes pre-shift and 15 minutes post-shift per day, revealed ***30,449,855 minutes of uncompensated pre- and post-shift time*** recorded in CityTime. *Id.* This amount, divided by all 2,519 EMT/Paramedics, is 12,088 minutes—***more than 201 hours***—of unpaid work per EMT/Paramedic, work the City supervisors saw being performed, viewed on CityTime, yet did nothing to ensure payment for.[4]

Further, that the City drafted the 2014 Command Order—which specifically identified as compensable the very tasks that EMT/Paramedics testified they perform

---

[4]     The average award based on the Stipulated Final Judgment is $5,744.85 in total damages. SPA63-108.

daily without compensation—makes it patently clear that the City knew there was a pervasive practice of performing unpaid pre- and post-shift work as early as 2008. A4914. The City's failure to issue the Order, which paid lip service to preventing unpaid work, for six years, with its failure to enforce the Order, demonstrates that the City made a choice to ***permit*** the practice of performing unpaid pre-shift and post-shift work. A2064, A2257-59, A2261, A2387-93.

Finally, the City is wrong that performance evaluations commending pre-shift work, as well as the 2014 Command Order, could not be used to prove liability on a collective-wide basis. Br., 52-53. To the contrary, this is ***exactly*** the type of evidence on which collective liability is based, as it demonstrates the City's "policy or practice of suffering or permitting pre-shift and post-shift work." SPA46.

This Court is tasked with determining whether the jury's verdict is ***founded in the evidence presented*** when such evidence is considered ***in the light most favorable to EMT/Paramedics*** as the non-movants. *Vill. of Freeport*, 814 F.3d at 608. As set forth above, there was ample evidence for the jury to correctly conclude that the City violated the FLSA by maintaining a policy or practice of suffering or permitting pre-shift and post-shift overtime work without compensation.

## A. CityTime Captures Work Time But is Designed to Steal Overtime Pay

The City argues the jury's verdict should be overturned because public entities are subject to a "different set of financial, legal, and political constraints" than other

38

employers. Br., 47. The FLSA applies equally to public entities and private employers. 29 U.S.C. § 203(d). The City is not authorized by its public agency status to withhold lawfully earned overtime compensation from its hardworking EMT/Paramedics.

Yet CityTime, which the City requires EMT/Paramedics to use, is designed to do just that. Although the City admits its purpose is to capture EMT/Paramedics' work time (A1888, A2124), CityTime is not a "simple electronic system." Br., 7. To the contrary, there was ample evidence for the jury to conclude that the system was designed to be confusing and to discourage and prevent employees from being paid for overtime work. *See* Br., 46.

The City ignores the evidence presented that EMT/Paramedics' unpaid overtime work is captured by the system **to the minute**, but that the City chose to program CityTime not to pay for all—or even some—of these uncompensated minutes. A1894, A2937-38.

Moreover, the City fails to acknowledge that it made it exceedingly difficult for EMT/Paramedics to request compensation for the pre-shift and post-shift work tasks at issue here, as CityTime required EMT/Paramedics to justify any overtime work from a set list of seven discrete "reasons" from a drop-down menu—none of which were the pre-shift activities that EMT/Paramedics perform daily. A1319-20, A1909-10. Thus, the jury heard unrebutted testimony that the City's written policies

and practices necessitated unpaid work to be "ready for duty," *see* Statement of the Case, Part B.2, *supra,* all while knowing that that CityTime **could not support overtime requests for that work.** A1319-40, A1810, A1844, A1949.

In addition, the City required EMT/Paramedics to complete a legalistic certification with which they had no choice but to agree if they wanted a paycheck. A1304, A1474-75, A1632, A1762, A1850-51. Evidenced by a specific complaint from another City Department, the City knew the certification was confusing and inaccurate (A2164-65), yet still failed to provide EMT/Paramedics with any training on the certification. A1632, A1762, A1851, A2027. The purpose of the certification was "to hold up in court," not to ensure employees were paid for their recorded work time. A2150.

Moreover, contrary to the City's assertions, Br., 45, the jury heard evidence that the City told EMT/Paramedics that they would not be paid for pre-shift work. Indeed, multiple EMT/Paramedics testified that they were either told that requests for pre-shift overtime would be denied, or actually had overtime requests for pre-shift and post-shift work rejected. A1323, A1544-45, A1556, A1688, A1987, A2021-22, A2856. Deputy Chief Ortiz admitted that he would not allow EMTs/Paramedics to request overtime for inspecting equipment pre-shift because such overtime is not "requestable." A1844.

The evidence showed that the City intended to design its overly complicated timekeeping system to do exactly what the *Kuebel* Court warned against—"obligate its employees to record their own time, have its managers unofficially pressure them not to record overtime, and then, when an employee sues for unpaid overtime, assert that his claim fails because his timesheets do not show any overtime." *Kuebel,* 643 at 364. The City made an active choice to employ a program which, despite capturing all work minutes, does not pay employees for those minutes. Under these circumstances, the City cannot absolve itself of liability and eschew constructive knowledge by relying on the legalistic certification requirements in CityTime.

## B. The Jury Properly Held That the City Willfully Violated the FLSA

The City wrongly asserts that "plaintiffs have not shown that the City willfully failed to compensate them for their pre-shift work." Br., 54. Notably, the City does not challenge the jury's willful finding with respect to the City's failure to pay for post-shift work. Moreover, the City never requested a verdict form that separated willfulness into pre-shift and post-shift questions. The City has waived its right to parse that question now. *See* Fed. R. Civ. P. 49(a); *Jarvis*, 283 F.3d at 56.

Nevertheless, the jury correctly concluded the City willfully violated the FLSA. The statute of limitations for FLSA claims is extended to three years for "willful" violations. 29 U.S.C. § 255(a). An employer acts willfully where it "either knew or showed reckless disregard for the matter of whether its conduct was

41

prohibited by the statute." *Herman v. RSR Sec. Servs.,* 172 F.3d 132, 141 (2d Cir. 1999) (quoting *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133 (1988)).

The City claims no reasonable juror could hold the City acted willfully with respect to the pre-shift claim because it utilizes CityTime. Br., 54-57. The existence of CityTime—which is flawed and designed for the purpose of limiting the City's legal liability—does not absolve the City of its FLSA violations. Instead, the jury heard extensive evidence of the City's actions that went well beyond "mere negligence" from which the jury reasonably concluded that the City acted with reckless disregard for its compliance with the FLSA. *Young v. Cooper Cameron Corp.,* 586 F.3d 201, 207 (2d Cir. 2009).

First, the jury heard from multiple witnesses that thousands of EMT/Paramedics put the City on notice in 2005 that they wanted payment for the very same pre- and post-shift work at issue here. A1345, A1491, A1552-53, A1827, A2076, A2110, A2266, A2345. Yet, the City failed to pay EMTs/Paramedics for this work. A1697, A1827. Then, by filing the instant lawsuit in 2013, EMT/Paramedics *again* put the City on notice that they wanted to be paid for their pre-shift and post-shift work time; once again the City took no action to correct the violations. Indeed, it took the City a full year after this lawsuit was filed to issue Command Order 2014 ostensibly prohibiting the pre- and post-shift work, and even then, it never enforced it.

42

The City claims that it responded to this 2005 notice by implementing CityTime, a "clear mechanism" for reporting pre-shift and post-shift work. Br., 56. Yet, the jury heard that the process of transitioning to an electronic timekeeping system began in 2003, and that the system ***does not*** "enable" employees to request overtime for their pre-shift work. A1319-40, A1810, A1844, A1910, A1949. The City implemented a mandatory certification as part of the overtime payment process but failed to train employees on that certification and, when notified that it was confusing, took no steps to modify it. A1304, A1474-75, A1632, A1762, A1850-51, A2027, A2151-52, A2164-65.

Further, the jury heard the City failed to consider the nature of the EMT/Paramedics' pre-shift and post-shift work in programming and implementing CityTime. A2117-18. The City failed to study what EMS personnel do when they are clocked in prior to the start of their paid shifts and after the end of their shifts during the 30,000,000 uncompensated minutes captured in CityTime. A2076, A2117-18, A2940-42, A2947, A2951. Similarly, the City failed to explore the "major discrepancies" between EMT/Paramedics' punch times and their paid work time as required by 29 C.F.R. § 785.48. A2946-48.

The jury also heard that the City failed to seek advice from the Department of Labor about whether its pay practices complied with the law and, when it did receive advice from its own Law Department, failed to follow that advice. A2114-15,

43

A2951. The FDNY Director of Payroll, Timekeeping and Compliance admitted that he did not know supervisors are responsible for ensuring overtime is paid, even when no overtime request is submitted. A1903. The jury also heard that despite knowledge that EMT/Paramedics worked *de facto* overlapping shifts, the City took no steps to implement paid overlapping shifts. A2198-99, A2270.

Finally, the jury likely saw the 2014 Command Order for what it was: a litigation risk management document that did nothing to prohibit unpaid pre- and post-shift work or ensure work was compensated.

This is not a situation in which "there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise or conjecture" or that "the evidence in favor of the [City] is so overwhelming that reasonable and fair-minded persons could not arrive at a verdict against it." *Kinneary v. City of New York,* 601 F.3d 151, 155 (2d Cir. 2010). Evidence of the City's willful violation is overwhelming and must not be disturbed.

### POINT II

### THE JURY VERDICT FORM ACCURATELY REFLECTED THE DAMAGES QUESTIONS AT ISSUE IN THE CASE, WAS CONSISTENT WITH THE LAW, AND WAS SUPPORTED BY THE TRIAL EVIDENCE

The City argues that—despite the significant evidence before the jury that CityTime accurately captured the worktime at issue in this case (i.e., up to 15

minutes of daily pre-shift work and up to 15 minutes of daily post-shift work)—a new damages trial is necessary. The City's argument ignores that 1) the two Verdict Questions at issue are consistent with law, and the Court's answer to the jury's question complied with the jury instructions and the long-settled continuous workday rule; and 2) the jury had sufficient evidence from which to answer "yes" to both questions.

## A. The Trial Court's Verdict Form Asked the Right Questions and Was Supported by Jury Instructions Consistent with the FLSA

The City erroneously claims it is entitled to a new damages trial because "the district court never asked the jury to decide whether all of plaintiffs' time between clocking in and clocking out constituted 'time worked' under FLSA," and because the verdict sheet only asked whether EMT/Paramedics had proved, by a preponderance of the evidence, that 'the CityTime system accurately captures the unpaid pre-shift work minutes at issue in this case (i.e., up to 15 minutes of pre-shift work)" and "the identical question for post-shift time." Br., 58-59.

 "Decisions as to the format and language to be used in a special verdict form are committed to the trial court's discretion, and there is no abuse of discretion if the verdict form, when read in conjunction with the instructions to the jury, clearly

presents the material factual issues raised by the pleadings and evidence." *Lore,* 670 F.3d at 159-60. Such is the case here.[5]

In response to the jury's question, the Court properly instructed the jury that the verdict form asked it to determine whether the pre-shift and post-shift work time in question is accurately captured in CityTime; this instruction correctly reflects the issue to be determined by the jury. *See* A3271-72. While the City continues to insist that the jury should have been asked to determine whether ***all of the time*** captured in CityTime is time worked (Br., 58-59) such a question would have been plainly incorrect.

First, EMT/Paramedics were not required to prove that every second recorded in CityTime is "work." Such a requirement would violate the continuous workday doctrine. As the jury was specifically instructed, non-work time is still compensable ***if it occurs during the continuous workday***. *See* A3251-52 ("The workday includes all time within that period, whether or not the employee is engaged in working throughout that entire period. Thus, time spent on activities that may not constitute

---

[5] The City cites *Blyden v. Mancusi*, 186 F.3d 252, 265 (2d Cir. 1999), as the sole support for its claim that Questions 3 and 4 "deprived" it of its right "to have a jury decide a core factual dispute." Br., 62. There, a new trial was ordered because the verdict form and questions were so muddled that it "was not at all clear exactly what issues the district court intended to be established at the liability trial. The jury instructions reflect that confusion." *Blyden,* 186 F.3d at 265. Here, in contrast, the verdict form coupled with the Court's carefully and legally supported jury instructions ensured that the jury understood the ramifications of the verdict. *See* A3247-3249.

compensable work on their own nevertheless should be included in the paid continuous workday if they occur between the time when an employee begins their principal activities and the time when the employee ceases performing their principal activities."); *IBP, Inc., v. Alvarez*, 546 U.S. 21, 28-29, 37 (2005); *Kuebel*, 643 F.3d at 359-60 (same); 29 C.F.R. § 790.6(a). Instructing the jury that it must determine that all time recorded in CityTime was "time worked" would be inconsistent with the continuous workday rule and the jury instructions.

Moreover, the City has a non-delegable duty under the FLSA to accurately record employees' work time. *See Kuebel,* 643 F.3d at 363. *See also Caserta*, 273 F.2d at 944, 946. City witnesses admitted CityTime is designed to accurately record work time. A1888; A2124. Thus, once EMT/Paramedics proved that the CityTime system accurately captures EMT/Paramedics' work time through evidence and testimony—as the verdict form asked the jury to determine—damages based on unpaid minutes captured in CityTime could be calculated.

The City next argues that there was evidence that would have permitted a reasonable juror to conclude that some of EMT/Paramedics' pre-shift and post-shift time was not time worked under the FLSA, but the Court took "that question out of the jury's hands." Br., 63. Again, this is plainly false. The jury was first charged with determining whether the City had a policy or practice of suffering or permitting unpaid pre-shift and post-shift work. A3783. ***Only*** upon a finding that the City

suffered or permitted such work was the jury to answer Questions 3 and 4. Moreover, if the jury determined that CityTime did not accurately capture the unpaid pre-shift and/or post-shift work at issue in this case (i.e., up to 15 minutes), they were instructed to *move on to the next questions to determine how much time EMT/Paramedics spent performing the suffered or permitted uncompensated work.* A3259-60; *see* A3280-81 (Questions 5 and 6). As such, if the jury found CityTime to be an inaccurate measure of compensable work, the jury was specifically instructed to determine the average number of unpaid pre- and/or post-shift minutes that should be counted as work time each week and calculate damages using those inputs. Given these instructions, the City was not deprived of any defenses with respect to the damages at issue.

## B. Dr. Lanier's Testimony and Damages Calculations are Consistent with the Verdict Rendered by the Jury and Other Evidence Proving that CityTime Accurately Captures Work Time

The City argues that the testimony of damages expert Dr. Lanier meant that EMT/Paramedics needed to prove, and the jury needed to find, that every single minute captured by CityTime was "time worked." Br., 58. The City's argument is predicated on a fundamental mischaracterization of Dr. Lanier's testimony.

Dr. Lanier was *not* offered nor accepted by the court as an expert on whether the unpaid time recorded in CityTime constituted FLSA compensable work. Instead, he was offered to, and provided, unrebutted testimony about the total number of

48

unpaid overtime minutes recorded in CityTime among the 2,519 EMT/Paramedics, and the monetary damages associated with those minutes. A2421 (30,449,855 unpaid pre- and post-shift overtime minutes equates to $6,231,529 in overtime backpay). His testimony went to mathematical calculations; the EMT/Paramedics demonstrated to the jury through **other evidence** (*e.g.*, EMT/Paramedic testimony, City witness testimony, City policies, etc.) that those minutes were compensable work time.

In an effort to avoid the overwhelming evidence that the EMT/Paramedics were suffered or permitted to perform unpaid work, the City highlights a few minutes of testimony. These discrete examples[6] cannot diminish the fact that nearly every EMT/Paramedic testified that they began performing compensable work (*e.g.*, discussing work with a Lieutenant, inspecting equipment, etc.), starting the continuous workday, almost immediately after clocking into CityTime. *See* A1258,

---

[6] One single witness, EMT Jones, testified that he clocked into CityTime, obtained his boots from his locker, changed into uniform, and then inspected his Technician's Bag (A2782-83). Similarly, the City cites muddled testimony from Paramedic Perry regarding the difference between a single paid overtime request and the time he clocked out of CityTime to suggest that he was not working during the captured uncompensated time on that one single day. Br., 62; A2051. As the District Court noted in rejecting the City's Rule 50 argument, "any potential discrepancies for isolated Plaintiffs are marginal." SPA 133-34. This is consistent with the Supreme Court's admonition that the "remedial nature of the FLSA and the great public policy which it embodies militate against making the burden of proving uncompensated work an impossible hurdle for the employee." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 456 (2016) (internal punctuation and brackets omitted).

A1261-63, A1526, A1528-30, A1584, A1668, A1746-48, A1944, A2002-04, A2567-68, A2766-67, A2841, A2848, A2898-99; *see also* A1447. Similarly, EMT/Paramedics testified they performed compensable work after the post-shift exchange (securing and storing their PPE on gear racks, and their personal equipment, including Technician's Bags, in their locker) shortly before scanning out of CityTime. A1297-98, A1541, A1604-05, A1681, A1685, A1759, A1964, A2018, A2586, A2773, A2808-10, A2845-46, A2854, A2903. Thus, there was sufficient evidence from which the jury could conclude that CityTime accurately captures the EMT/Paramedics' continuous compensable workday.

Moreover, nearly every example the City cites to support its argument "that not all of plaintiffs' time at the station before or after their shifts constituted time worked" (Br., 61) either 1) occurred after EMT/Paramedics' continuous compensable workday began;[7] 2) involved mid-shift time for which EMT/Paramedics were paid and is not part of the damages in this case;[8] or 3) were

---

[7] EMT Bentkowski testified that her first activity after clocking into CityTime was to get assignments from her Lieutenant. A1584. Thus, activities after that are part of the continuous workday. The City cites testimony that the first thing Paramedic Perry did was to put on his uniform; however, the citation does not support that position as Perry testified that after clocking into CityTime, he gets information and orders from his Lieutenant and ***then*** changes into his uniform. A2003-04.

[8] EMT Bentkowski testified that on occasions, her ambulance would be out of service prior to the end of her paid tour, and the City required her to simply stay at the station during her paid shift. A1650-51.

purposefully misleading.[9] The jury heard overwhelming evidence that the time captured by CityTime was time worked and a few isolated instances, if that, do not affect the verdict. *See* Statement of the Case, Part B.2 at 7-8, *supra* (before paid shift EMT/Paramedics scan into CityTime, meet with Lieutenant, obtain and inspect PPE, and inspect and/or don equipment); *Id.* at Part B.3 at 11-13 (after end of paid shift EMT/Paramedics exchange equipment and information with oncoming shift and document equipment exchange in the Lieutenant's office, Paramedics exchange narcotics in the presence of the Lieutenant, EMT/Paramedics store PPE on gear racks and personal equipment in locker, and EMTs store Tech Bags).

Thus, Dr. Lanier's damages testimony, which simply calculates a dollar value for those minutes captured by the City's timekeeping system, was accurate. As the Court correctly instructed the jurors, "the law does not require EMT/Paramedics to prove the amount of their losses with mathematical precision, but only with as much definiteness and accuracy as the circumstances permit." A3258. The jury, considering the overwhelming evidence, reasonably found that the City's own system, designed to capture worktime, was indeed the best measure of the EMT/Paramedics' unpaid work.

---

[9]  The City claims Paramedic Anson saw coworkers in his station's kitchen; he actually testified that he had no idea if they were there prior to the start of their paid shift. A1355-56.

## POINT III

## THE DISTRICT COURT FOLLOWED THE LAW OF THE CASE DOCTRINE AND CORRECTLY INSTRUCTED THE JURY WITH RESPECT TO THE DE MINIMIS DEFENSE

The City challenges the District Court's legal conclusion that the City was not entitled to assert the de minimis defense as to *one of multiple activities* performed by EMTs after the end of their paid shift—exchanging equipment with the oncoming tour. Br., 63-68. The City's arguments lack merit.

### A. The Court Lacks Jurisdiction to Hear an Appeal of the District Court's Summary Judgment Decision

First, the City argues that the District Court erred in granting summary judgment in EMT/Paramedics' favor on the de minimis defense, and then dedicates all but one paragraph to the summary judgment record, claiming the Court should review that decision de novo. Br., 63-68. This is improper. A party cannot appeal an order denying summary judgment after a full trial on the merits because the decision is interlocutory and the Court, therefore, lacks jurisdiction to review it on appeal. *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011); 28 U.S.C. § 1291.

A motion for summary judgment does not preserve an issue for appellate review of a final judgment entered after trial. *Ortiz*, 562 U.S. at 184. While there are exceptions granted where the purported error was "purely one of law," *Keeling v. Hars*, 890 F.3d 43, 47 (2d Cir. 2015), the court will not entertain that exception

where the challenging party had the following avenues available: to petition for the right to file an interlocutory appeal pursuant to 28 U.S.C. § 1292(b); or where the case proceeds to trial, to file a motion (and renewed motions) pursuant to Rule 50 on that issue and then appeal the denial of that motion.

Both avenues were available to the City, but it failed to avail itself of them. The City did not seek an interlocutory appeal of the summary judgment decision. After trial, while the City did make a Rule 50 motion, *it specifically elected not to do so with respect to its de minimis defense and the court's prior summary judgment ruling on it*. A2473-82, A2487, A3129-44. Where a party could have moved under Rule 50 but elected not to, this Court will not hear an appeal of a prior denied motion for summary judgment after a full trial on the merits. *Omega*, 984 F.3d at 251.

### B. The Court's Jury Instructions Were Proper

At trial, the Court gave a detailed instruction on the de minimis defense. A3254-57. During the charging conference the District Court stated that, "in light of the testimony [the court] heard" at trial, it would apply the law of the case with respect to whether the equipment exchange was de minimis. A3100. Similarly, in response to the City's Rule 59 motion for a new trial, the District Court found that the decision to include this language in the jury charge was based on the law of the case doctrine, and that "upon further review of the trial record," there were no

"exceptional circumstances that would cause [it] to exercise [its] discretion to revisit and/or reverse" its earlier ruling. SPA130-31.

"The law of the case doctrine forecloses reconsideration of issues that were decided—or that could have been decided—during prior proceedings." *Doe v. East Lyme Bd. Of Educ.*, 962 F.3d 649, 662 (2d Cir. 2020). "[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case," *Arizona v. California*, 460 U.S. 605, 618 (1983), and the Court "expresses a general reluctance, absen[t] good cause, to reopen rulings that the parties have relied upon." *Tishmann v. ITT/Sheraton Corp.*, 145 F.3d 561, 564 (2d Cir. 1998).

Although the City recognized during the charging conference that the Court's de minimis instruction was based on its application of the law of the case doctrine (A3096), it now disavows that understanding, erroneously arguing that the District Court's instructions should be reviewed de novo. Br., 36. This is not the applicable standard. Instead, this Court reviews a district court's application of the law of the case doctrine for abuse of discretion. *Ariz. Premium Fin. Co. v. Employers Ins. of Wausau*, 586 Fed. Appx. 713, 716 (2d Cir. 2014). This standard is deferential: "we will only find 'abuse' when the district court's decision rests on an error of law or a clearly erroneous factual finding, or its decision cannot be located within the range of permissible decisions." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010)

(ellipses and some internal quotation marks omitted). Here, the trial testimony demonstrates the District Court did not abuse its discretion when it declined to revisit its previous decision, one the City failed to appeal, as the evidence demonstrates that EMTs' equipment exchange time is ***not*** de minimis.

To determine whether time is de minimis, courts apply a three-part test announced in *Reich v. New York City Transit Auth.,* 45 F.3d 646, 652 (2d Cir. 1995). *"*Factors to be considered in determining whether time should be excluded from compensation as de minimis [are]: (1) the practical administrative difficulty of recording the additional time; (2) the size of the claim in the aggregate; and (3) whether the claimants performed the work on a regular basis." *Kosakow v. New Rochelle Radiology Assocs. P.C.,* 274 F.3d 706, 719 (2d Cir. 2001) (quoting *Reich*). 29 C.F.R. § 785.47. The District Court's instruction on the de minimis defense was squarely in line with these standards and is, therefore, not erroneous. A3254-57. *See Henry*, 616 F.3d at 146 (where jury was not "misled about the correct legal standard or was otherwise inadequately informed of controlling law," the court will not disturb the verdict).[10]

The trial testimony demonstrates that EMTs' equipment exchange was not de minimis. First, the testimony demonstrates the time was easily recorded. Indeed, the

---

[10] Although the City challenged the District Court's decision to apply the law of the case doctrine, it does not challenge the instructions on the de minimis standard.

City's witnesses admitted that CityTime records the time EMTs spend working, including exchanging equipment. A1888 (purpose of CityTime is to accurately record work time); A2124. Similarly, City supervisors admitted they see how much time EMTs spend working without pay because they review recorded punch times. A1473, A2288, A2291. Thus, there are no practical administrative difficulties in recording the time spent performing this work.

Second, the testimony established that the exchange of equipment takes more than "a few minutes on occasional days." *Singh v. City of New York,* 524 F.3d 361, 371 (2d Cir. 2008). *See, e.g.,* A2844-55 (EMTs required to keep equipment until the shift ends, and the post-shift equipment and information exchange took 5 minutes on average). This is because EMTs are required to exchange and account for numerous items including CO meters, radiation meters, radios, glucose meters, ambulance keys, and computer tablets. *See, e.g.,* A1602-03, A1758-59. Indeed, even the scant trial testimony relied on by the City does not demonstrate that the exchange took less than two minutes. A1652 (while ***theoretically*** possible for it to take less than two minutes to conduct the exchange, in reality it ***never*** took less than that). Therefore, in the aggregate, day in and day out, the time spent exchanging required equipment was substantial.

Further, the City's own witnesses admitted that these equipment exchanges are required to, and do, occur on a routine and regular basis. A2326-2328, A1837-

38, A1839-40. Chief Fields—the head of the EMS Department—admitted that exchange of this equipment is compensable work. A2236.

This testimony demonstrates that the decision to apply the law of the case doctrine does not rest on an error of law or a clearly erroneous factual finding and can be easily found within the range of permissible decisions. *Myers*, 624 F.3d at 547. Thus, the District Court did not abuse its discretion.

Further, even if there had been an error in stating that the equipment exchange time was not de minimis, it was entirely harmless.

Significantly, no EMT received damages under the jury's verdict unless CityTime had captured at least eight minutes of unpaid time that day. A2409. The City's argument that if the exchange time for EMTs took only two minutes, the jury had to find that time to be de minimis, is a red herring because EMTs received ***no damages*** on days the time recorded was less than eight minutes. Moreover, the uncontroverted evidence demonstrates that after EMTs participate in the equipment exchange, they then perform ***additional work*** as part of the continuous workday, work that is also captured by CityTime but not paid, including securing and storing additional equipment. *E.g*., A2808-2809; A2904.

As explained in Point II, Part A, the Court properly instructed the jury in its charge on the continuous workday. A3251. This instruction is consistent with binding caselaw. Point II, Part A, *supra*. Thus, even if the District Court had not

57

applied the law of the case and allowed the City to present a de minimis defense with respect to the EMT's post-shift exchange, the exchange time, even if de minimis, would constitute compensable work time because the exchange takes place before the EMTs perform their last compensable activity of the continuous workday (i.e., before storing PPE, Tech Bags, and other required equipment).

## C. The City Waived Its Right to Object to the Format of the Verdict Form

The Verdict Question as to the City's liability for post-shift work reads:

Did the Plaintiff EMTs and Paramedics prove by a preponderance of the evidence that the Defendants have a policy or practice of suffering or permitting EMT/Paramedics to perform work after their shift without pay, in violation of the Fair Labor Standards Act?"

A3279. In requesting that this Court grant a new trial as to EMTs' post-shift work, while accepting the verdict as to the Paramedics, the City argues the jury should have considered the City's liability for EMTs' post-shift work *separately* from that of Paramedics.

The City *never objected* to the submission of one combined question to the jury as to its liability for post-shift work. Having been given the opportunity to propose edits to the District Court's proposed verdict sheet, the City made no changes to Question 2. *See* Dkt. 320.9 at 1-2. Where the City failed to make such a request prior to jury deliberations, the City cannot request relief now, years later. *See Jarvis*, 283 F. 3d at 57 ("failure to object to . . . the form of [a jury] interrogatory prior to the jury retiring results in a waiver of that objection."). Yet, that is exactly

what the City asks this Court to do here. The City made a strategic decision that the jury should determine liability for EMTs and Paramedics together; after losing decisively on this issue at trial, the City wants a do-over. There are no grounds for such a request.

## CONCLUSION

Given the ample trial testimony and evidence, and Second Circuit caselaw, supporting the jury's unanimous verdict for the EMT/Paramedics, combined with the lack of justification for a new trial, the EMT/Paramedics respectfully request that the Court deny the City's appeal in its entirety.

Dated: March 10, 2022                    Respectfully submitted,

                                        */s Molly A. Elkin*
                                        Gregory K. McGillivary
                                        Molly A. Elkin
                                        Sara L. Faulman
                                        Diana J. Nobile
                                        McGILLIVARY STEELE ELKIN LLP
                                        110 Vermont Ave., N.W. Suite 1000
                                        Washington, D.C. 20005
                                        Phone: (202) 833-8855

                                        *Attorneys for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared using Microsoft Word, and according to that software, it contains 13,999 words, not including the table of contents, table of authorities, this certificate, signature block and the cover.

*/s Molly A. Elkin*
Molly A. Elkin